[No. S157151. Feb. 25, 2010.]

Conservatorship of the Person of JOHN L.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Petitioner and Respondent, v.
JOHN L., Objector and Appellant.

134

136

## COUNSEL

Linda M. Fabian, under appointment by the Supreme Court, for Objector and Appellant.

Morton P. Cohen for California Association of Mental Health Patients' Rights Advocates as Amicus Curiae on behalf of Objector and Appellant.

Ann E. Menasche for Protection & Advocacy, Inc., as Amicus Curiae on behalf of Objector and Appellant.

John J. Sansone, County Counsel, Leonard W. Pollard II and William A. Johnson, Jr., Deputy County Counsel, for Petitioner and Respondent.

Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Petitioner and Respondent.

## OPINION

**BAXTER, J.**—At a hearing on April 4, 2006, the superior court considered a petition to establish a conservatorship of the person of John L. pursuant to the Lanterman-Petris-Short Act (LPS Act or Act; Welf. & Inst. Code, § 5000 et seq.).[1] A report prepared by a conservatorship investigator the month before the hearing stated that John "made it clear" he did not want a conservator and did not need any assistance. At the hearing, however, John's appointed attorney informed the court that John did not want to be present in court and was not contesting the conservatorship. Relying on the attorney's representations, the court excused John's presence, granted the petition, and appointed the Public Conservator of San Diego County as conservator of John's person. We conclude the superior court did not commit any statutory or due process violation in doing so. We therefore affirm the judgment of the Court of Appeal.

### FACTUAL AND PROCEDURAL BACKGROUND

The LPS Act authorizes the superior court to establish a conservatorship of a person who is gravely disabled as a result of a mental disorder. (§§ 5350, 5008, subd. (h)(1).) Here, the Public Conservator of San Diego County (Public Conservator) sought to establish an LPS conservatorship of the person of 60-year-old John L. The relevant facts, all of which occurred in 2006, are undisputed.

---

[1] Unless otherwise indicated, all further statutory references are to this code.

On February 15, John was taken to an emergency psychiatric unit in San Diego on an involuntary basis. He was yelling and screaming and unable to provide a chief complaint. Later that day, John was transferred to the behavioral health unit at Palomar Hospital, under the care of Dr. Christopher Gorman. During John's stay, he was described as extremely manic, grandiose, nondirectable, intrusive, manipulative, and having poor boundaries. He refused antipsychotic medication until February 22, when a court-appointed hearing officer found that he lacked the capacity to withhold his consent on the matter. (See *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303 [271 Cal.Rptr. 199].)

On February 24, Dr. Gorman executed a declaration recommending a conservatorship based on his belief that John was gravely disabled as a result of a mental disorder, diagnosed as "Bipolar Disorder, manic [with] psychotic features." (§ 5352.1.) He cited the circumstances that John had been evicted from his apartment, and that while residing at Palomar Hospital he took food from other patients' trays, barricaded the door to his room (which required fire department intervention), often walked around with his shirt open, and had attempted to leave his room one night naked from the waist down. Although Dr. Gorman considered other alternatives to conservatorship, he found no suitable alternative available for John.

Dr. Gorman executed a second declaration stating he had informed John that a recommendation for conservatorship of the person was being filed with the court, and that a petition for appointment of a conservator also might be filed. He explained to John what the appointment of a conservator meant and identified the possible orders that could result from a hearing on the petition. He also informed John of his rights to be present at the hearing, to hire an attorney of his choice or to have one appointed for him, to demand a court or jury trial on the issue of grave disability, to confront and cross-examine witnesses, and to produce witnesses in opposition to the petition.

On March 7, the Public Conservator filed an "Ex Parte Petition for Appointment of Temporary Conservator and Conservator of the Person" for John (the petition), along with Dr. Gorman's two declarations. (§§ 5350, 5352.) That same day, the court appointed the Public Conservator as temporary conservator. (§ 5352.1.)

On March 17, a "Citation for Conservatorship" was issued, notifying John he was required to appear at a hearing on April 4, at which time the court would determine whether to appoint the Public Conservator as a conservator of his person. (§ 5350; Prob. Code, § 1823.) The temporary conservator filed a "Conservatorship Investigation Report" (the investigation report), prepared by investigator Candy Elson of the Public Conservator's office, which

recommended that a conservatorship be established to ensure John would obtain necessary mental heath treatment. (§ 5354.) The investigation report summarized John's lengthy history of mental illness dating back to the early 1960's and noted both his previous diagnosis of schizophrenia and his current diagnosis as "Bipolar Manic with Psychosis." The report recounted that John had numerous past involuntary hospitalizations with a long history of medication noncompliance, a significant history of violent, agitated, and obstreperous behavior when hospitalized, and an "extremely turbulent" present course at Palomar Hospital.

The investigation report additionally described investigator Elson's meeting with John at Palomar Hospital on March 3. According to Elson, John appeared somewhat subdued and sedated, and also was "religiously preoccupied" and delusional. John, however, "made it clear that he did not want a Conservator and thought that he did not need any assistance." The report concluded there was no viable alternative to conservatorship, and recommended "a closed, locked facility" as "the least restrictive, most appropriate placement to meet [John's] needs." (§ 5354.)

John was personally served with the petition and citation for conservatorship. His appointed counsel, Lidia Garcia, was served with the petition, the investigation report, and notice of the April 4 hearing for the appointment of the Public Conservator as a conservator of the person for John.

John did not attend the April 4 hearing. As relevant here, Garcia appeared at the hearing on John's behalf and reported to the court, "Your [H]onor, I have visited with him at Telecare Choices. Recently he was here. He had requested a writ which he took off calendar. At any rate Mr. L[.] is doing much better. [¶] We discussed the conservatorship and on Friday then he wished to put it over until yesterday so that he could think about it. When we met he indicated that at this time he was not contesting the conservatorship. He did not want to be present in court. So we would ask the court to excuse his presence."

After excusing John's presence from the hearing, the superior court received the investigation report into evidence. (§ 5354.) It then ordered the appointment of the Public Conservator as conservator of the person of John and further ordered that John not be permitted to vote or contract, to possess a driver's license or a firearm, or to refuse or consent to medical treatment. Consistent with the investigation report's recommendation, the court determined that the least restrictive placement available and necessary for John was a closed, locked treatment facility.

On appeal, John contended his rights under the LPS Act, as well as his state and federal constitutional due process rights, were violated when the

superior court proceeded with the April 4 conservatorship hearing in his absence and ordered the conservatorship without any admissible evidence that he knowingly and intelligently waived his right to appear at the hearing. The Court of Appeal affirmed.[2]

### DISCUSSION

The central issue is whether the superior court properly proceeded with the April 4, 2006, hearing on the petition to establish a conservatorship of the person in John's absence. It bears emphasis that, before his appeal, John raised no objection to the court's actions; in fact, it is undisputed he told his appointed attorney he was not contesting the proposed conservatorship and did not wish to appear at the hearing. The court excused John's presence and appointed a conservator only after hearing the attorney's representations on the matter.

We first review the requirements of the LPS Act to determine whether a violation occurred when the superior court excused John's absence based upon his appointed counsel's representations. If no statutory violation appears, we must then determine if the court nonetheless deprived John of due process in establishing the conservatorship as it did. These are legal issues subject to de novo review. (See *Smith v. Rae-Venter Law Group* (2002) 29 Cal.4th 345, 357 [127 Cal.Rptr.2d 516, 58 P.3d 367]; *Conservatorship of Christopher A.* (2006) 139 Cal.App.4th 604, 610 [43 Cal.Rptr.3d 427].)

### A. *The LPS Act*

■ The LPS Act governs the involuntary detention, evaluation, and treatment of persons who, as a result of mental disorder, are dangerous or gravely disabled. (§ 5150 et seq.) The Act authorizes the superior court to appoint a conservator of the person for one who is determined to be gravely disabled (§ 5350 et seq.), so that he or she may receive individualized treatment, supervision, and placement (§ 5350.1). As defined by the Act, a person is "gravely disabled" if, as a result of a mental disorder, the person "is unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A).)

■ Integral to the LPS Act is its procedure for ascertaining whether a conservatorship of the person should be established. Each county is required

---

[2] John's conservatorship ended during the pendency of the appellate process. "We exercise our discretion to decide this otherwise moot case because it raises important issues that are capable of repetition but likely to evade review." (*In re Lemanuel C.* (2007) 41 Cal.4th 33, 38, fn. 4 [58 Cal.Rptr.3d 597, 158 P.3d 148]; see *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1011, fn. 5 [36 Cal.Rptr.2d 40, 884 P.2d 988].)

to designate an agency to undertake an investigation to aid the court in determining whether a conservatorship is appropriate (§ 5351), and the investigating officer must submit a comprehensive written report to the court prior to the conservatorship hearing (§ 5354). The written report must include "all relevant aspects of the person's medical, psychological, financial, family, vocational and social condition, and information obtained from the person's family members, close friends, social worker or principal therapist." (*Ibid.*) It must also state whether the investigator recommends a conservatorship and, if not, identify all available alternatives. (*Ibid.*) When a conservatorship is recommended, the report must make recommendations concerning a suitable conservator, the powers and duties to be granted and imposed upon the conservator, the legal disabilities to be imposed upon the proposed conservatee, and the appropriate placement. (§§ 5355, 5356.)

The procedures for establishing a conservatorship include a number of requirements pertaining to notice, hearing and trial rights, and other matters. Specifically, the petition for appointment of a conservator of the person and the citation for conservatorship must be served upon the proposed conservatee at least 15 days before the scheduled hearing date, and the proposed conservatee must be given notice of the privileges and rights subject to deprivation as part of the conservatorship. (§ 5350; Prob. Code, §§ 1823, 1824.) A hearing must be held within 30 days of the date of the petition, and the court must "appoint the public defender or other attorney for the . . . proposed conservatee within five days after the date of the petition." (§ 5365.) The proposed conservatee "shall have the right to demand a court or jury trial on the issue whether he or she is gravely disabled," but must do so before or within five days following the hearing on the conservatorship petition. (§ 5350, subd. (d).) The party seeking imposition of the conservatorship must prove the proposed conservatee's grave disability beyond a reasonable doubt, and a jury verdict finding such disability must be unanimous. (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 235 [152 Cal.Rptr. 425, 590 P.2d 1].) An LPS conservatorship automatically terminates after one year, and reappointment of the conservator must be sought by petition. (§ 5361.)

To determine whether the superior court violated the LPS Act when it proceeded with the April 4, 2006, hearing in John's absence, we must first find what the Act requires. In construing the Act, our goal is to ascertain and effectuate the Legislature's intent. (*Munson v. Del Taco, Inc.* (2009) 46 Cal.4th 661, 666 [94 Cal.Rptr.3d 685, 208 P.3d 623]; *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 543 [67 Cal.Rptr.3d 330, 169 P.3d 559].)

We start by observing that the LPS Act makes no express mention of any specific requirement for the presence of a proposed conservatee at a

hearing to establish a conservatorship of the person. Section 5350, however, mandates that LPS conservatorships shall be established pursuant to the procedure set forth in the Probate Code, subject to certain listed exceptions. As pertinent here: "The procedure for establishing . . . a conservatorship under this chapter shall be the same as that provided in Division 4 . . . of the Probate Code, *except as follows*: [¶] . . . [¶] (f) Conservatorship investigation shall be conducted pursuant to this part and shall not be subject to Section 1826 . . . of the Probate Code. [¶] . . . [¶] (h) As otherwise provided in this chapter." (§ 5350, italics added.) In turn, division 4 of the Probate Code embodies the Guardianship-Conservatorship Law (Prob. Code, § 1400 et seq.), a separate statutory scheme governing the appointment of conservators of the person for "adults who for any reason are incapable of taking care of themselves." (38 Cal.Jur.3d (2006) Incompetent Persons, § 3, p. 180.)[3]

■ Before delving into the relevant Probate Code procedures, we briefly review some important distinctions between LPS conservatorships and probate conservatorships. Unlike an LPS conservatorship, a probate conservatorship does not depend on a showing of grave disability resulting from a mental disorder, and involuntary commitment is not contemplated. (See generally 38 Cal.Jur.3d, *supra*, Incompetent Persons, § 3, p. 180.) While LPS conservatorship proceedings may be initiated only by the agency-designated conservatorship investigator (§ 5352), the proposed conservatee, spouse, domestic partner, relative, or other "interested" agency, person, or friend has standing to file a petition for a probate conservatorship (Prob. Code, § 1820, subd. (a)). Finally, the court need not appoint counsel in all proceedings to establish a probate conservatorship because, unlike the situation in LPS conservatorships, there is no risk of involuntary commitment.[4] But because the person seeking the probate conservatorship may or may not be acting free of ulterior motives, the court generally must appoint a "court investigator" to perform an independent and comprehensive investigation. (Prob. Code, § 1454; Prob. Code, § 1826 [providing exception in subd. (*o*) when the proposed conservatee personally executes the petition or nominates the conservator, and attends the hearing].)[5]

---

[3] Henceforth, this opinion will refer to conservatorships established pursuant to the Guardianship-Conservatorship Law as probate conservatorships.

[4] In contrast to LPS procedures, appointment of counsel in a probate conservatorship proceeding is mandatory only if the proposed conservatee requests counsel, or if the court determines, based on information contained in the court investigator's report or obtained from any other source, that the appointment would be helpful to the resolution of the matter or is necessary to protect the proposed conservatee's interests. (Prob. Code, § 1471, subds. (a), (b).)

[5] The individual appointed as the "court investigator" may not have a personal or other beneficial interest in the proceeding (Prob. Code, § 1454, subd. (a)), and must have the following qualifications: "(1) The training or experience, or both, necessary (i) to make the investigations required under this division, (ii) to communicate with, assess, and deal with persons who are or may be the subject of proceedings under this division, and (iii) to perform

▮ We now return to section 5350, requiring that the conservatorship procedures set forth in division 4 of the Probate Code be followed in establishing LPS conservatorships where they do not conflict with LPS Act provisions. As relevant here, division 4 contains Probate Code section 1825, which provides that "[t]he proposed conservatee shall be produced" at the hearing to establish a conservatorship, subject to three exceptions. We are concerned with the exception set forth in subdivision (a)(3) of that section (Probate Code section 1825(a)(3)), providing that a proposed conservatee may be excused from attending the hearing if he expressly informs the "court investigator" that he is unwilling to attend and does not contest the conservatorship or oppose the proposed conservator.[6] To aid in the operation of Probate Code section 1825, Probate Code section 1826 requires the court investigator to interview the proposed probate conservatee personally, to provide relevant information regarding the hearing to establish a conservatorship and the proposed conservatee's rights, to determine the individual's inability or unwillingness to attend the hearing and desire to contest the establishment of the conservatorship or appointment of the proposed conservator, and to report the investigator's determinations to the court. (Prob. Code, § 1826, subds. (c), (e), (f), (k).)[7] The Probate Code's mechanism for excusing a proposed

the other duties required of a court investigator. [¶] (2) A demonstrated sufficient knowledge of law so as to be able to inform conservatees and proposed conservatees of the nature and effect of a conservatorship proceeding and of their rights, to answer their questions, and to inform conservators concerning their powers and duties." (Prob. Code, § 1454, subd. (b).)

[6] Probate Code section 1825, subdivision (a), requires that the proposed conservatee "be produced" at the hearing to establish a probate conservatorship, "except in the following cases: [¶] (1) Where the proposed conservatee is out of the state when served and is not the petitioner. [¶] (2) Where the proposed conservatee is unable to attend the hearing by reason of medical inability. [¶] (3) Where the court investigator has reported to the court that the proposed conservatee has expressly communicated that the proposed conservatee (i) is not willing to attend the hearing, (ii) does not wish to contest the establishment of the conservatorship, and (iii) does not object to the proposed conservator or prefer that another person act as conservator, and the court makes an order that the proposed conservatee need not attend the hearing." This case does not implicate the first two statutory exceptions, pertaining to proposed conservatees who are out of state and those who are unable to attend the hearing because of medical inability. (§ 1825, subd. (a)(1), (2).)

[7] Probate Code section 1826 provides in pertinent part that, regardless of whether the proposed conservatee attends the hearing, the court investigator shall interview the proposed conservatee personally (*id.*, subd. (a)); inform the proposed conservatee of the nature, purpose, and effect of the proceeding, and of the right to oppose the proceeding, to attend the hearing, to have the matter of the establishment of the conservatorship tried by jury, to be represented by legal counsel, and to have legal counsel appointed by the court if the proposed conservatee is unable to retain counsel (*id.*, subd. (b)); determine whether it appears the proposed conservatee is unable or unwilling to attend the hearing (*id.*, subd. (c)); determine whether the proposed conservatee wishes to contest the establishment of the conservatorship (*id.*, subd. (e)); determine whether the proposed conservatee objects to the proposed conservator or prefers another person to act as conservator (*id.*, subd. (f)) and whether the proposed conservatee wishes to be represented by legal counsel and desires appointment of legal counsel (*id.*, subds. (g), (i)); determine whether the appointment of legal counsel would be helpful to the

conservatee's production and attendance through a court investigator promotes the dual legislative goals of minimizing the individual's unwanted court appearances, while guarding against abuse of the conservatorship process by ensuring the individual actually wants to forgo attendance and opposition to the proposed conservatorship.

■ In determining whether and to what extent the procedures set forth in Probate Code section 1825 apply to LPS conservatorship proceedings, we must give effect to Welfare and Institutions Code section 5350's explicit command that the procedure for establishing LPS conservatorships shall be the same as that provided for establishing probate conservatorships, except that "[c]onservatorship investigation shall be conducted pursuant to [the LPS Act] and shall not be subject to [Probate Code] Section 1826 . . . ." (§ 5350, subd. (f).) The quoted language is critical for, as noted above, the Probate Code contemplates the use of a court-appointed investigator to conduct an independent investigation into whether a conservatorship should be established, and, in particular, Probate Code section 1826 requires the court investigator to interview the proposed conservatee in order to ascertain and report the information necessary to trigger the application of Probate Code section 1825(a)(3). (Prob. Code, § 1826, subds. (c), (e), (f), (k).) By contrast, the agency-designated official charged with conducting a conservatorship investigation in an LPS proceeding has none of the duties specified in Probate Code section 1826 (see, *ante*, fn. 7), and in particular has no obligation to investigate or report on the proposed conservatee's unwillingness to attend the hearing or nonopposition to the conservatorship. (See Welf. & Inst. Code, §§ 5354, 5356.)

■ In order to give effect to Welfare and Institutions Code section 5350's mandate that LPS conservatorships be established pursuant to the same procedure used to establish probate conservatorships where there is no conflict between the two schemes, we hold that Probate Code section 1825(a)(3)'s procedure pertaining to a proposed conservatee's production and attendance at the hearing must be followed in LPS cases, with one exception. That exception, rooted in section 5350, subdivision (f), effectively bars the authorization and use of a court-appointed investigator to convey the desire of a proposed conservatee not to appear at a hearing. Section 5350's prohibition on the use of court investigators, however, does not foreclose using other procedures generally applicable in civil proceedings, namely, Code of Civil Procedure section 283, subdivision 1, which permits an attorney to

---

resolution of the matter or is necessary to protect the proposed conservatee's interests in any case where the proposed conservatee does not plan to retain legal counsel and has not requested appointment of counsel (*id.*, subd. (j)); and report to the court in writing "[w]hether the proposed conservatee is not willing to attend the hearing, does not wish to contest the establishment of the conservatorship, and does not object to the proposed conservator or prefer that another person act as conservator" (*id.*, subd. (k)(2)).

make binding representations in court on behalf of her client. Indeed, as we explain below, construing the LPS Act to permit counsel for proposed LPS conservatees to seek excusal of their clients' presence is logical and furthers the purposes of the Act.

In providing that the procedure set forth in division 4 of the Probate Code shall apply in establishing LPS conservatorships absent a statutory conflict, Welfare and Institutions Code section 5350 plainly requires the operation of Probate Code section 1827, which provides in full: "The court shall hear and determine the matter of the establishment of the conservatorship *according to the law and procedure relating to the trial of civil actions*, including trial by jury if demanded by the proposed conservatee." (Italics added.) While proceedings under the LPS Act are already commonly viewed as being civil in nature (e.g., *Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 537 [53 Cal.Rptr.3d 856, 150 P.3d 738] (*Ben C.*)), Probate Code section 1827 makes it all the more clear that the laws of civil procedure apply in LPS conservatorship proceedings. (See *Conservatorship of Maldonado* (1985) 173 Cal.App.3d 144, 148 [218 Cal.Rptr. 796].)

Of significance here is Code of Civil Procedure section 283, subdivision 1, which prescribes the manner in which an attorney may bind her client in a civil proceeding. (See *City of Fresno v. Baboian* (1975) 52 Cal.App.3d 753, 757 [125 Cal.Rptr. 332].) Under that statute, an attorney "shall have authority" to "bind [her] client in any of the steps of an action or proceeding by [her] agreement filed with the Clerk, or entered upon the minutes of the Court." (Code Civ. Proc., § 283, subd. 1.) In view of Welfare and Institutions Code section 5350, Probate Code section 1827, and Code of Civil Procedure section 283, subdivision 1, we hold that a client who tells his appointed attorney he is unwilling to attend the hearing and does not wish to contest a proposed LPS conservatorship may reasonably expect his attorney to report such information to the court, with binding effect. (See *Conservatorship of Mary K.* (1991) 234 Cal.App.3d 265, 271 [285 Cal.Rptr. 618] (*Mary K.*); *Conservatorship of Maldonado, supra,* 173 Cal.App.3d at p. 148.)[8]

Although Probate Code section 1825 speaks in terms of requiring that a proposed conservatee "be produced" at the hearing unless one of three exceptions is shown, John suggests the provision is properly understood as conferring a "right" upon a proposed conservatee to attend the hearing. (Cf. Prob. Code, § 1823, subd. (b)(5).) John's interpretation of the statute, however, does not support a different outcome. Even assuming Probate Code section 1825 grants such a right of attendance, the right is of legislative origin

---

[8] We express no opinion on the situation where an appointed attorney seeks to excuse her client's presence at the hearing without the client's consent or over the client's objection.

and not a constitutional right. When a statutory right in a civil commitment scheme is at issue, the proposed conservatee may waive the right through counsel if no statutory prohibition exists. (E.g., *People v. Rowell* (2005) 133 Cal.App.4th 447, 452–454 [34 Cal.Rptr.3d 843] [in sexually violent predator recommitment proceeding, trial court properly accepted counsel's representation that client wanted court trial instead of jury trial]; *Mary K., supra,* 234 Cal.App.3d at p. 271.) ■ Our review of the LPS Act discloses no provision purporting to bar a proposed conservatee's reliance on counsel to convey to the court a waiver of the right to attend a hearing to establish an LPS conservatorship.[9]

Moreover, allowing a proposed LPS conservatee to communicate such matters through counsel is substantially consistent with the procedure applicable in probate conservatorships, without posing any conflict with LPS Act provisions. As indicated above, Probate Code section 1825(a)(3) contemplates that a person who has no objection to a proposed conservatorship or conservator and no desire to attend the hearing may have his production at the hearing excused after informing the court of his views through a court investigator, i.e., one who has "demonstrated sufficient knowledge of law so as to be able to inform . . . proposed conservatees of the nature and effect of a conservatorship proceeding and of their rights, [and] to answer their questions." (Prob. Code, § 1454, subd. (b)(2); see, *ante,* fn. 5.) Our interpretation of the LPS Act allows a person who has no objection to a proposed LPS conservatorship, and no desire to attend the hearing, to similarly have his production excused when he has communicated his wishes to the court through an advocate who is professionally obligated to perform these same advisory duties. Permitting counsel to serve this function is only logical, and satisfies the Legislature's intent both to safeguard the rights of proposed conservatees and "to minimize, when appropriate and warranted, actual court appearances" in proceedings to establish a conservatorship. (*Conservatorship of Moore* (1986) 185 Cal.App.3d 718, 731 [229 Cal.Rptr. 875] (*Moore*).)[10]

---

[9] John also suggests the term "court investigator," as used in Probate Code sections 1825 and 1826, may include persons, such as investigator Candy Elson in the instant case, who conduct conservatorship investigations in LPS proceedings. Starting from this premise, he contends that Elson's investigation report did not satisfy Probate Code section 1825(a)(3)'s requirement for excusing his production at the April 4 hearing because it indicated he was opposed to the conservatorship. These contentions are lacking in merit. First, we have already explained that an agency-appointed LPS conservatorship investigator has no obligation to investigate or report on the matters addressed in Probate Code section 1825(a)(3). Second, the LPS Act, properly construed, allowed John to obtain court excusal of his production through his attorney. Third, although John evidently told Elson in early March that he was opposed to a conservatorship, there is no dispute he told his attorney otherwise shortly before the April 4 hearing.

[10] Relying on an unenacted bill that he claims was "later revised and became" the bill that was enacted as a predecessor of Probate Code section 1825, John contends the Legislature

██ In this case, John's appointed attorney, Lidia Garcia, informed the superior court at the April 4 hearing that she had discussed the conservatorship with John, and that John indicated to her (1) "at this time he was not contesting the conservatorship" and (2) he "did not want to be present in court." There is no suggestion that Garcia misrepresented what John told her or that she lacked actual authority to waive John's presence on his behalf. (See *Conservatorship of Maldonado, supra,* 173 Cal.App.3d at p. 148.) Garcia's conveyance of John's stated desire to absent himself from the hearing was duly entered upon the minutes of the court, and was thus effective to bind John. (§ 5350; Prob. Code, § 1827; Code Civ. Proc., § 283, subd. 1.) The superior court did not violate the LPS Act when it excused John's production and proceeded with the April 4 hearing without him in attendance.

### B. *Due Process*

Because a conservatorship may result in an involuntary civil commitment, John contends that the interests involved in conservatorship proceedings are no less fundamental than those at stake in criminal proceedings, and that therefore many of the due process safeguards against the erroneous deprivation of liberty in the criminal context—such as the right to a hearing, the right to trial, and the right to confront witnesses—are equally important and apply in the conservatorship context. John claims he was denied due process because the superior court found he waived these fundamental rights, without any showing his waiver was valid. More specifically, although John does not dispute that his attorney accurately informed the court he did not want to attend the hearing or contest the conservatorship, he argues that the court improperly relied on the attorney's unsworn statements without asking her any questions to determine whether he was capable of providing, and had provided, a knowing and intelligent waiver of his rights. (See *Thorn v. Superior Court* (1970) 1 Cal.3d 666, 675 [83 Cal.Rptr. 600, 464 P.2d 56] (*Thorn*) [absent the patient's understanding "of the nature of his detention and

---

considered, but later rejected, a provision that would have allowed the proposed conservatee's attorney to waive presence at the probate conservatorship hearing. (Assem. Bill No. 4260 (1973–1974 Reg. Sess.) § 17; see Assem. Com. on Judiciary, Dig. of Assem. Bill No. 4260 (1973–1974 Reg. Sess.) p. 2.) Even assuming the unenacted bill may be considered a part of the legislative history of Probate Code section 1825, we reject John's suggestion that the Legislature's action (or inaction) evinces an intent to preclude attorney waivers of presence.

The unenacted bill reflects that, prior to the time the Probate Code provided authority for court investigators in 1976, the Legislature considered a provision requiring appointment of counsel in all proceedings to establish a probate conservatorship. (Assem. Bill No. 4260 (1973–1974 Reg. Sess.) § 17; see Assem. Com. on Judiciary, Dig. of Assem. Bill No. 4260 (1973–1974 Reg. Sess.) p. 2; cf. Stats. 1976, ch. 1357, § 7, p. 6184; Assem. Com. on Judiciary, Dig. of Assem. Bill No. 1417 (1975–1976 Reg. Sess.) as amended May 15, 1975, p. 3.) But because the Legislature decided not to mandate counsel in all such proceedings, its decision to forgo the accompanying provision for waivers through counsel is hardly surprising.

of his rights, it is difficult to perceive how he could knowingly decide whether or not to exercise them"].)

■■■ " 'The question of whether due process has obtained can only be answered by scrutinizing the circumstances in which the deprivatory action arose. [Citations.] "Because of the broad spectrum of concerns to which the term must apply, flexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error. [Citation.]" ' [Citation.]" (*Conservatorship of Tian L.* (2007) 149 Cal.App.4th 1022, 1028 [57 Cal.Rptr.3d 382].) In conservatorship cases, we balance three factors to determine whether a particular procedure or absence of a procedure violates due process: the private interests at stake, the state or public interests, and the risk that the procedure or its absence will lead to erroneous decisions. (*Ben C.*, *supra*, 40 Cal.4th at pp. 538–539 [relying on *Lassiter v. Department of Social Services* (1981) 452 U.S. 18 [68 L.Ed.2d 640, 101 S.Ct. 2153] and *In re Sade C.* (1996) 13 Cal.4th 952 [55 Cal.Rptr.2d 771, 920 P.2d 716]].) We also consider " 'the availability of prompt remedial measures.' " (*Thorn*, *supra*, 1 Cal.3d at p. 673.)

There can be no doubt that "[t]he liberty interests at stake in [an LPS] conservatorship proceeding are significant. A person found to be gravely disabled may be involuntarily confined for up to one year, and the conservatorship may be extended for additional one-year periods, so long as the person remains gravely disabled." (*Ben C.*, *supra*, 40 Cal.4th at p. 540.) In addition to such confinement, a conservatorship may result in the loss of other personal rights, including driving privileges, contracting and voting rights, and the right to refuse or consent to medical treatment. (See *ibid.*; § 5357.) A person also has a reputational interest in not being improperly or unfairly stigmatized. (See *Conservatorship of Roulet*, *supra*, 23 Cal.3d at pp. 228–230.)

Likewise, there is no question that the public interests promoted by the LPS Act are substantial. The goals of the Act include " 'ending the inappropriate and indefinite commitment of the mentally ill, providing prompt evaluation and treatment of persons with serious mental disorders, guaranteeing and protecting public safety, safeguarding the rights of the involuntarily committed through judicial review, and providing individualized treatment, supervision and placement services for the gravely disabled by means of a conservatorship program. (§ 5001.)' [Citation.] The Act also serves to protect the mentally ill from criminal victimization (§ 5001, subd. (g)) and from the myriad forms of suffering endured by those unable to care for themselves." (*Ben C.*, *supra*, 40 Cal.4th at p. 540.)

As much as the private interests at stake are weighty and deserving of protection, the stated purposes of the LPS Act foreclose any argument that an LPS commitment is equivalent to criminal punishment in its design or purpose. Because of their differing objectives, "the analogy between criminal proceedings and proceedings under the LPS Act is imperfect at best and . . . not all of the safeguards required in the former are appropriate to the latter." (*Ben C.*, *supra*, 40 Cal.4th at p. 538 [declining to require *Anders/Wende* procedures in LPS conservatorship appeals]; see *Conservatorship of Susan T.*, *supra*, 8 Cal.4th at p. 1020 [exclusionary rule inapplicable in LPS conservatorship proceedings]; *Conservatorship of Joel E.* (2005) 132 Cal.App.4th 429, 439–440 [33 Cal.Rptr.3d 704] [no constitutional right to self-representation]; *Conservatorship of Bones* (1987) 189 Cal.App.3d 1010, 1015–1016 [234 Cal.Rptr. 724] [no constitutional right not to testify].)

 Nonetheless, because the private interests implicated in an LPS conservatorship are significant, "several layers of important safeguards" have been built into the system (*Ben C.*, *supra*, 40 Cal.4th at p. 540) to "vigilantly guard[] against erroneous conclusions" in such proceedings (*id.* at p. 542). For starters, the LPS Act provides for a "carefully calibrated series of temporary detentions for evaluation and treatment" before a person may be found to be gravely disabled and subject to a year-long commitment. (*Ben C.*, at p. 541.) The process begins with an initial 72-hour detention for evaluation and treatment (§ 5150), which may be extended by certification for 14 days of intensive treatment (§ 5250) and is subject to additional extension periods of detention and involuntary commitment when further intensive treatment is found necessary (e.g., §§ 5270.15, 5300).

 Moreover, a number of notice requirements must be satisfied before a conservatorship may be imposed. The proposed conservatee must be advised of the right to a hearing, the right to representation of counsel, and the right to demand a court or jury trial. (§§ 5350, 5365; Prob. Code, § 1823; *In re Gandolfo* (1984) 36 Cal.3d 889, 897 & fn. 3 [206 Cal.Rptr. 149, 686 P.2d 669].) Additionally, the proposed conservatee is entitled to service of the conservatorship petition and the citation for conservatorship at least 15 days before the specified hearing date (§ 5350; Prob. Code, § 1824), as well as notice of the privileges and rights subject to deprivation as part of the conservatorship and a copy of the conservatorship investigation report (§§ 5350, 5356; Prob. Code, § 1823).

 Another important protection is the requirement that the court appoint an attorney for the proposed LPS conservatee within five days after the date of the petition. (§ 5365.) Like all lawyers, the court-appointed attorney is obligated to keep her client fully informed about the proceedings at hand, to advise the client of his rights, and to vigorously advocate on his

behalf. (Bus. & Prof. Code, § 6068, subd. (c); *Conservatorship of David L.* (2008) 164 Cal.App.4th 701, 710 [79 Cal.Rptr.3d 530] [a proposed LPS conservatee has a statutory right to effective assistance of counsel]; *Conservatorship of Benvenuto* (1986) 180 Cal.App.3d 1030, 1037, fn. 6 [226 Cal.Rptr. 33] ["Implicit in the mandatory appointment of counsel is the duty of counsel to perform in an effective and professional manner."]; see *Mary K.*, *supra*, 234 Cal.App.3d at p. 272; *Conservatorship of Ivey* (1986) 186 Cal.App.3d 1559, 1566 [231 Cal.Rptr. 376].) The attorney must also refrain from any act or representation that misleads the court. (Bus. & Prof. Code, § 6068, subd. (d); Rules Prof. Conduct, rule 5-200(B).)

■ Finally, prompt remedial relief is available through several mechanisms after a conservatorship has been established. As indicated, an LPS conservatorship automatically terminates after one year. (§ 5361.) During this one-year period, the conservatee may twice petition for rehearing as to his status as a conservatee (§ 5364), and need only prove by a preponderance of the evidence at the rehearing that he is no longer gravely disabled. (*Ben C.*, *supra*, 40 Cal.4th at p. 541.) Additionally, the conservatee may twice petition for a hearing to contest the rights denied under section 5357 or the powers granted to the conservator under section 5358. (§ 5358.3.) The availability of these remedial measures "will *ordinarily* insure that any change in the conservatee's condition or other circumstance affecting the appropriateness of the restrictions placed on him is recognized within a reasonable time." (*In re Gandolfo*, *supra*, 36 Cal.3d at p. 899.)

We now assess the risk that judicial reliance on an attorney's unsworn statements in court regarding a proposed conservatee's waiver of presence and trial rights will lead to erroneous conservatorship decisions. To aid in our consideration, we find it useful to look to the Court of Appeal's analysis in *Moore*, *supra*, 185 Cal.App.3d 718, a case addressing a similar due process challenge in the analogous context of a petition to reestablish an LPS conservatorship. In *Moore*, the public conservator had served the petition and all required notices on the conservatee and his appointed attorney. (See § 5362.) Prior to the noticed hearing date, the attorney filed a sworn declaration stating she had ascertained that the conservatee did not oppose reestablishment of conservatorship and did not request a hearing. On the basis of that declaration and the submitted medical evidence, the superior court followed statutory procedures and, on its own motion and without a formal hearing, reappointed the public conservator and reimposed a restriction that the conservatee could not refuse treatment directly bearing on his grave disability. (*Moore*, at p. 724.)

In analyzing the adequacy of the statutory ex parte reestablishment procedures followed by the superior court, *Moore* reviewed the relevant statutory

notice, hearing, and trial provisions[11] and additionally considered the application of the local rules that directed counsel to inform the court, via a sworn affidavit, if the conservatee had no opposition to the conservator's reappointment. *Moore* determined that not only did the combination of these procedures provide "constitutionally sound safeguards against error," but they affirmatively "welcomed and encouraged [the conservatee's] participation in the conservatorship decision." (*Moore, supra,* 185 Cal.App.3d at p. 730.) Moreover, by ensuring that counsel would inform the court of any nonopposition to the proposed reestablishment, the procedures allowed the conservatee "to avoid a potentially uncomfortable and disruptive court appearance which, in light of his nonopposition to reestablishment, would have likely been brief and pro forma." (*Ibid.*) *Moore* further observed that, even assuming the court acts in error, any "loss of liberty would have arguably been de minimus" because the conservatee could challenge the ex parte reestablishment under statutory provisions (§§ 5362, 5364) or anytime by writ of habeas corpus. (*Moore,* at p. 730; cf. *In re Gandolfo, supra,* 36 Cal.3d at pp. 899–900 [habeas corpus available only in extraordinary circumstances where the statutory procedures are shown to be inadequate and to result in unreasonable consequences greatly detrimental to conservatee].)

In a passage that speaks to the situation here, *Moore* emphasized the significance of a conservatee's representation by counsel in determining the validity of the conservatee's waiver of a hearing or trial: " 'When counsel is present, a voluntary and intelligent waiver of known rights may properly be inferred from the record, without a specific on-the-record showing as to each right.' " (*Moore, supra,* 185 Cal.App.3d at p. 733.) *Moore* also rejected the contention that conservatees who have been found gravely disabled are unable to knowingly and intelligently waive their right to a hearing. As the decision observed, "conservatees are not, by reason of their conservatorship, automatically considered incompetent, and their ability to knowingly and intelligently waive their hearing rights is a question of fact . . . ." (*Id.* at p. 732; see § 5331 ["No person may be presumed to be incompetent because he or she has been evaluated or treated for mental disorder . . . , regardless of whether such evaluation or treatment was voluntarily or involuntarily received."]; *In re Qawi* (2004) 32 Cal.4th 1, 17 [7 Cal.Rptr.3d 780, 81 P.3d 224] [" 'one of the cardinal principles of LPS' " is " 'that mental patients may not be presumed incompetent solely because of their hospitalization' "]; *Riese v. St. Mary's Hospital & Medical Center, supra,* 209 Cal.App.3d at p. 1319 ["LPS recognizes that patients may be involuntarily committed yet nevertheless remain capable of giving informed consent."].)

---

[11] The LPS Act provides that the right to demand a court or jury trial on the issue of grave disability also applies in proceedings to reestablish conservatorship. (§ 5350, subd. (d); see § 5362.)

 Returning to the instant case, we reach a conclusion similar to the one obtained in *Moore, supra,* 185 Cal.App.3d 718. When we consider the combination of due process protections that have been built or read into the LPS Act, including the prehearing notice and counsel requirements and the requirement for a comprehensive conservatorship investigation report, as well as the familiar duties imposed on counsel in the representation of LPS clients and the availability of remedies after a conservatorship is in place, we have no difficulty concluding that these numerous checks sufficiently guard against the risk of erroneous conservatorship decisions, without the need to impose additional waiver-related requirements. Accordingly, a superior court may properly find a waiver of presence and trial rights when informed by the attorney that the proposed conservatee does not want to attend the hearing to establish the LPS conservatorship and does not oppose the conservatorship. Whether the proposed conservatee has knowingly and intelligently waived his presence and trial rights is a question of fact; it may not be presumed that a person found gravely disabled, or one who has been evaluated or treated for a mental disorder, is incompetent to waive such rights.

Here, John does not deny he informed his appointed attorney, Lidia Garcia, that he did not wish to attend the hearing and did not contest the proposed LPS conservatorship. John claims, however, that Garcia's representations on the matter were contradicted by investigator Elson's report stating that, in their meeting on March 3, John "made it clear that he did not want a Conservator and thought that he did not need any assistance." We disagree. As reported by Garcia and confirmed by court records, John's actions after his meeting with Elson gave rise to the reasonable implication that his views substantially changed during the month preceding the Tuesday, April 4, 2006, hearing.

At the April 4 hearing, Garcia described the following chronology of events to the superior court. After the March 3 meeting with investigator Elson, John filed a writ petition opposing his detention, and he thereafter appeared in court but decided not to pursue the writ. In this regard, Garcia was referring to events already known to the court.[12] Garcia then explained that she and John discussed the conservatorship, and that on the Friday before the April 4 hearing John wanted more time to think about it. When the two later met, John told Garcia he was not contesting the conservatorship and did not want to be present in court. On this record, the court could reasonably conclude that while John initially opposed a conservatorship when asked

---

[12] The record before us reflects that the judge who handled John's writ petition was the same judge presiding at the April 4 hearing. John's petition, denying he had a mental disorder that rendered him dangerous or gravely disabled, was presented to the court on March 6 and set for hearing the next day. The court issued a writ requiring John's production at the March 7 hearing, and John appeared at the hearing but withdrew the writ petition.

about the subject on March 3, he subsequently changed his mind and decided he no longer wished to contest the conservatorship and did not want to attend the April 4 hearing.[13]

██ John complains the court should not have relied on his attorney's representations because they were not given under oath. We conclude that sworn statements are not necessary in this context. Misrepresenting to the court that a client has no objection to a conservatorship is, among other things, a serious violation of the Business and Professions Code and the State Bar Rules of Professional Conduct. (Bus. & Prof. Code, §§ 6068, subd. (d), 6106; Rules Prof. Conduct, rule 5-200(B).) Because an attorney remains answerable for such misconduct (Bus. & Prof. Code, §§ 6077, 6100; see *Clark v. Willett* (1868) 35 Cal. 534, 539), there is little to be gained by requiring counsel to submit her statements under oath.

More importantly, the Code of Civil Procedure provides that an attorney "shall have authority" to "bind [her] client in any of the steps of an action or proceeding by [her] agreement . . . entered upon the minutes of the Court." (Code Civ. Proc., § 283, subd. 1.) That is exactly what happened here. John told his appointed attorney he did not contest the proposed conservatorship and did not want to attend the hearing. The attorney then informed the court of John's position, which was duly entered upon the court minutes. No more was necessary. (See *Mary K., supra,* 234 Cal.App.3d at p. 271; *Conservatorship of Maldonado, supra,* 173 Cal.App.3d at p. 148.)[14]

---

[13] On February 22, a court-appointed hearing officer found that John lacked the capacity to withhold his consent to antipsychotic medication. On March 7, John was placed under a temporary conservatorship that restricted his rights to vote and contract, and his right to consent or refuse to consent to medical treatment. Because these circumstances were apparent from the record at the time of the April 4 hearing, John contends the superior court should not have assumed he was capable of knowingly or intelligently waiving his presence and trial rights. We are not persuaded.

As the record indicates, John began taking antipsychotic medication after the hearing officer's February 22 finding. He thus had been on medication for well over a month by the time he met with Garcia shortly before the April 4 hearing. Garcia reported at the hearing that John was "doing much better," and that not only was he able to discuss the conservatorship with her, but he even asked for more time to "think about it" before making a decision. On this record, the court cannot be faulted for accepting the proffered waiver. (See § 5331.)

[14] *People v. Davis* (2005) 36 Cal.4th 510 [31 Cal.Rptr.3d 96, 115 P.3d 417] does not compel otherwise. In *Davis,* we held that an attorney did not effectuate a valid waiver of the defendant's federal and state rights to presence at a pretrial hearing because, even though the attorney informed the court that the defendant was aware of the purpose of the hearing and had decided to waive his presence, the defendant had not submitted a waiver in written form and there was no evidence he understood the right he was waiving and the consequences of doing so. (*Davis,* at pp. 529–532.) That decision, however, involved the federal constitutional right to be personally present at a criminal trial (U.S. Const., 6th & 14th Amends.), as well as a statutory right of presence that could not be waived absent the defendant's personal written waiver (Pen. Code, § 977, subd. (b)). As explained above, we find this case to present another

Finally, both John and amicus curiae California Association of Mental Health Patients' Rights Advocates contend a proposed LPS conservatee must appear in court in person, or the court must go to him, so the court may observe the individual directly and conduct personal questioning in order to evaluate his capacity and ensure his waivers are intelligent and knowing. We disagree.

We find that the value of requiring an unwilling proposed conservatee to appear before the court is too slight to justify its adoption as part of the conservatorship process. First, although a court's observation of an individual might be useful in some circumstances, an attorney will generally have a more extensive opportunity to confer with her client about his rights and to weigh the client's behavior. (See *Conservatorship of Chambers* (1977) 71 Cal.App.3d 277, 288 [139 Cal.Rptr. 357].) Second, compelling a proposed conservatee to appear before the court, irrespective of his stated nonopposition to conservatorship and request to be absent, would effectively render his right to waive presence and a trial meaningless. Third, mandating attendance under such circumstances might also result in "a potentially uncomfortable and disruptive court appearance" for the proposed conservatee which, in light of his nonopposition, would likely be "brief and pro forma." (*Moore, supra,* 185 Cal.App.3d at p. 730.)

In sum, we conclude the superior court did not deprive John of due process when it established the conservatorship of his person in his absence. This conclusion is consistent with decisions generally recognizing that, even though certain rights implicated in civil proceedings are substantial, they may be waived by an attorney with the client's express consent. (*Mary K., supra,* 234 Cal.App.3d at pp. 269–271 [bench trial held after counsel reported client's wish to waive jury trial]; cf. *Linsk v. Linsk* (1969) 70 Cal.2d 272, 278 [74 Cal.Rptr. 544, 449 P.2d 760] [counsel cannot abdicate a substantial right of the client *contrary to express instructions*]; *Conservatorship of Christopher A., supra,* 139 Cal.App.4th at p. 613 [attorney may not, *without the client's express consent,* enter into a stipulated judgment regarding placement, disabilities, and conservator powers].) It also finds support in prior decisions acknowledging that, in the absence of any contrary indication, the superior court may assume that an attorney is competent and fully communicates with the proposed conservatee about the entire proceeding. (E.g., *Mary K., supra,* 234 Cal.App.3d at p. 272; *Conservatorship of Ivey, supra,* 186 Cal.App.3d at p. 1566; see also *People v. Ngo* (1996) 14 Cal.4th

---

of those situations where "the analogy between criminal proceedings and proceedings under the LPS Act is imperfect at best and . . . not all of the safeguards required in the former are appropriate to the latter." (*Ben C., supra,* 40 Cal.4th at p. 538.)

30, 37 [57 Cal.Rptr.2d 456, 924 P.2d 97] [an attorney admitted to the California Bar is presumptively competent].)[15]

## CONCLUSION AND DISPOSITION

The superior court did not violate John's statutory or due process rights when it proceeded, in John's absence, with the April 4, 2006, hearing on the petition to establish a conservatorship of his person. The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

---

[15] John argues that the superior court's error in excusing him from the proceedings led to a second error, namely, that the court failed to conduct an on-the-record voir dire as required under Probate Code section 1828. No voir dire is required, however, when the court excuses the proposed conservatee's attendance pursuant to Probate Code section 1825(a)(3). (Prob. Code, § 1828, subd. (c).) Because the court properly accepted John's waiver of his rights through counsel, this contention fails.