Filed 3/13/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Conservatorship of the Person of A.J. | |
| PUBLIC GUARDIAN OF SAN FRANCISCO COUNTY, as Conservator, etc., Petitioner and Respondent, v. A.J., Objector and Appellant. | A170401 (City & County of San Francisco Super. Ct. No. PMH24024902) |

A.J. appeals from an order appointing the San Francisco Department of Disability and Aging Services Office of the Public Conservator (Public Guardian) as his conservator under the Lanterman-Petris-Short Act (LPS Act).  (Welf. & Inst. Code, § 5000 et seq., undesignated statutory references are to this code.)  He contends the Public Guardian improperly argued in its closing that he was unable to provide for his basic need for shelter because of his history of being involuntarily detained.  He further argues the trial court improperly delegated to the Public Guardian the duty to designate the least restrictive alternative placement.  We remand for the court to designate the least restrictive placement, but otherwise affirm.

1

# BACKGROUND

Around 2010, A.J. started experiencing auditory hallucinations, resulting in hospitalizations in 2018 and 2021. He was also incarcerated on multiple occasions in Monterey County, San Francisco County, and Oregon. He was diagnosed in 2023 with schizophrenia and found mentally incompetent to stand trial on various assault and battery charges. The criminal court later vacated the incompetency order and directed the Public Guardian to investigate whether to initiate a LPS conservatorship.

As a result of that investigation, the Public Guardian filed a petition to establish a temporary conservatorship and/or conservatorship of A.J. because he was gravely disabled as a result of a mental health and/or severe substance abuse disorder. (§§ 5008, 5350.) His treating psychiatrist noted his history of randomly provoking and assaulting individuals, behavior that appeared tied to ongoing paranoid delusions and auditory hallucinations. The psychiatrist further explained that — although A.J. expressed amenability to mental health treatment — he does not believe he has a mental illness, does not believe medication would manage his symptoms, and has historically demonstrated an unwillingness and incapability to voluntarily accept treatment. The trial court appointed a temporary conservator in 2024.

At a jury trial, a social worker echoed the opinions of the treating psychiatrist regarding A.J.'s unwillingness to take medication and his lack of insight into his mental illness. According to the social worker, his history of assaultive behavior — a physical fight with his father in 2021 during which a gun was fired, a fight with a co-worker, his belief his boss was calling him a murderer — was a reaction to his psychiatric problems. His delusions resulted in paranoia, causing him to lose control and place himself in

2

dangerous situations. According to the social worker, while A.J. was able to find an apartment with roommates, he experienced a problem with keeping the housing due to his assaultive conduct. And A.J. testified that, as a result of their ongoing conflicts, his father attempted to evict him.

The treating psychiatrist also testified A.J. lacked insight into the nature of his disorder — he simply thought he was being targeted by a federal conspiracy involving satellites. His past violent behavior — including pushing a woman who was walking her dog outside a store, and spitting at and pushing other people — was driven by his mental disorder. While antipsychotic medication, in the psychiatrist's opinion, was medically necessary to mitigate A.J.'s symptoms, it was unlikely he would voluntarily take it. For housing, the psychiatrist acknowledged A.J. planned to temporarily stay with an aunt while he searched for more permanent housing, but he expressed concerns about A.J. staying there for a longer period. Specifically, his mental health issues impact his behavior and ability to fulfill expectations associated with living in another's home. Indeed, A.J.'s past behavior and pattern of aggressive incidents toward others, he opined, was "inconsistent with maintaining housing."

During its closing argument, the Public Guardian argued A.J. was gravely disabled, in part, because he has been unable to provide himself shelter. At times during the past nine years, he was either hospitalized to address his schizophrenia or in jail — time that he was unable to provide for his basic needs of shelter. Although he occasionally lived with his father, those periods were marked by conflict. For instance, his father tried to evict him and, on another occasion, there was a violent conflict between the two. The Public Guardian emphasized there was no testimony or written documentation from a third party willing to provide shelter. It summarized

3

the treating psychiatrist and social worker testimony — that A.J.'s untreated mental illness jeopardizes his ability to maintain adequate housing, and his assaults on other people due to his psychotic symptoms have resulted in him losing housing.

The jury determined A.J. was gravely disabled. After excusing the jury, the trial court appointed a conservator for A.J., and gave the Public Guardian the power to place him in, among other things, a psychiatric, nursing, or other state-licensed facility.

## DISCUSSION

"The LPS Act governs the involuntary detention, evaluation, and treatment of persons who, as a result of mental disorder, are dangerous or gravely disabled." (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 142.) Where a criminal defendant has received treatment in a state hospital for the purpose of restoring their competency to stand trial but has been returned to criminal court because they cannot be restored, the court shall order a conservatorship investigator to initiate conservatorship proceedings. (Pen. Code, § 1370, subd. (c)(3).) Courts may appoint a conservator for individuals who are gravely disabled — unable to provide for their basic personal needs for food, clothing, shelter, personal safety or necessary medical care due to a mental disorder. (§§ 5350, subd. (b)(1), 5008, subd. (h)(1)(A).) The LPS Act intends to provide individualized treatment, supervision, and placement. (*John L.*, at p. 142.)

A petition to establish a conservatorship must include recommendations concerning a suitable conservator, powers and duties to be granted to a conservator, legal disabilities imposed on the proposed conservatee, and the appropriate placement. (*Conservatorship of John L.*, *supra*, 48 Cal.4th at p. 143; §§ 5355, 5356.) Establishing a person is gravely

4

disabled requires demonstrating, beyond a reasonable doubt, an objective finding that the individual, "due to [a] mental disorder, is incapacitated or rendered unable to carry out the transactions necessary for survival or otherwise provide for his or her basic needs of food, clothing, or shelter." (*Conservatorship of Carol K.* (2010) 188 Cal.App.4th 123, 134.) "Proposed conservatees have the right to a jury trial to determine whether they are gravely disabled." (*Conservatorship of K.P.* (2021) 11 Cal.5th 695, 709.) Issues of statutory interpretation are reviewed de novo. (*Conservatorship of Brokken* (2021) 61 Cal.App.5th 944, 947.)

First, A.J. argues the Public Guardian's closing argument improperly reasoned he was unable to provide himself with shelter simply based on prior involuntary detentions. According to A.J., the jury thus relied on an improper legal theory when making its determination. He further argues this argument contradicts the goals of the LPS Act, including the ending of inappropriate and indefinite commitment of people who are mentally ill. We disagree.

Critically, A.J. fails to provide — and we cannot find — any authority for his assertion that the jury may not *consider* a proposed conservatee's prior hospitalizations and incarcerations due to mental illness when determining the existence of a grave disability. (*Conservatorship of K.P.*, *supra*, 11 Cal.5th at p. 718 ["Amenability to voluntary treatment is thus relevant to the ultimate question of grave disability"].) More importantly, A.J.'s prior involuntary hospitalizations and detentions were simply one of many factors upon which the Public Guardian relied to demonstrate his inability to provide for shelter. It also cited his aggressive behavior that resulted in his losing prior housing with his parents; testimony from A.J.'s psychiatrist noting his aggressive behavior resulted in his inability to keep housing; and the absence

5

of any testimony or written documentation from a third party who would provide shelter. (*Conservatorship of Jesse G.* (2016) 248 Cal.App.4th 453, 461 [person not gravely disabled based on testimony provided by third party offering assistance to help with proposed conservatee's basic personal needs for food, clothing or shelter].) Ample evidence supports these arguments, including evidence that his behavior led to his father attempting to evict him and his inability to keep his housing with roommates. Viewing the record as a whole, we discern no basis to conclude the Public Guardian primarily argued A.J. was unable to provide for his shelter — and hence was gravely disabled — simply because he had been involuntarily confined in the past. In light of this conclusion, we do not address A.J.'s claims of prejudice.

Second, A.J. urges us to remand because the trial court failed to designate the least restrictive alternative placement. Although A.J. forfeited this argument on appeal by failing to object to the court's order below, we exercise our discretion to review this issue and agree. (*People v. Williams* (1998) 17 Cal.4th 148, 161–162, fn. 6.) Upon a grave disability finding, the court must "separately determine" the "level of placement appropriate for the conservatee." (*Conservatorship of Christopher A.* (2006) 139 Cal.App.4th 604, 612; § 5358, subds. (a)(1)(A), (c)(1).) The court must consider available placement alternatives when reviewing the conservator investigation report. (§ 5358, subd. (c)(1).) Priority must be given to "placement in a suitable facility as close as possible" to the conservatee's home or a relative's. (*Ibid*.) Critically, the court — not the conservator — must designate the "least restrictive alternative placement for the conservatee." (*Conservatorship of Amanda B.* (2007) 149 Cal.App.4th 342, 351.)

Here, however, the trial court expressly delegated this duty. The form order appointing the Public Guardian as A.J.'s conservator stated, "The

6

Conservator shall have the power to place the person, for psychiatric treatment, in a state-licensed facility or hospital, a county hospital, a hospital operated by the Regents of the University of California or the United States Government, [or] a facility or agency approved or accredited by the State Department of Health Care Services." Nothing in the order designates the level of placement. That a conservator has the discretion to transfer a conservatee to a less restrictive alternative placement without further hearing and court approval, and the fact that the Public Guardian intended to place A.J. in the least restrictive setting — an unlocked residential treatment facility with outpatient wraparound services — "does not eliminate the duty of the court to set the initial level of placement." (*Conservatorship of Amanda B.*, *supra*, 149 Cal.App.4th at p. 353; § 5358, subd. (d).) Thus, the court failed to "determine the least restrictive and most appropriate alternative placement for" A.J. (§ 5358, subd. (c)(1).) Reversal is required for the limited purpose of the trial court to fulfill this duty. (*Amanda B.*, at p. 355.) We further urge the court to review its form order for appointing a conservator of the person in light of our opinion.

## DISPOSITION

The matter is remanded to the trial court to designate a single level of placement that represents the least restrictive alternative placement available and necessary to achieve the purpose of treatment for A.J. In all other respects, the judgment is affirmed.

7

_____
RODRÍGUEZ, J.


WE CONCUR:


_____
FUJISAKI, Acting P. J.


_____
PETROU, J.


A170401; *Conservatorship of A.J.*

8

Trial Court: San Francisco City and County Superior Court

Trial Judge: Hon. Michael Rhoads

Counsel:

Law Offices of Jason Szydlik and Jason Szydlik for Objector and Appellant.

David Chiu, Kimiko Burton and Elizabeth McDonald Muniz for Petitioner and Respondent.