Filed 2/28/14  In re R.B. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re R.B., et al., Persons Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>R.B.,<br><br>        Defendant and Appellant. | A138965<br><br>(Contra Costa County<br>Super. Ct. Nos. J11-01259, J11-01260) |

At the conclusion of a hearing under section 366.26 of the Welfare and Institutions Code[1], the juvenile court terminated the rights of mother to her two children and directed the Contra Costa County Children and Family Services Bureau (the agency) to commence adoption proceedings.  Challenging the orders (one as to each child), mother argues the court failed to determine and consider the children's wishes as to their placement and adoption, and there was insufficient evidence to support termination of her parental rights.  Because we conclude mother's arguments do not require reversal and remand for further proceedings, we affirm the orders. [2]

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     The juvenile court also terminated father's parental rights but he has not filed a notice of appeal.

# FACTS[3]

## A.    Background

In September 2011, the agency filed petitions, later amended, in which it was alleged that mother's four-year-old daughter and nine-year-old daughter were at substantial risk of physical harm because of mother's mental health and alcohol abuse. At that time father was incarcerated in state prison. After the jurisdictional and dispositional hearings, the juvenile court sustained the amended petitions, declared the children dependents of the court, and offered reunification services to the parents. The children were initially placed in a foster care home, and later placed in the home of their paternal grandparents on February 2, 2012. After the "12-month" review hearing, which was ultimately held on January 17, 2013, the juvenile court found that returning the children to their parents would create a substantial risk to the children's well-being. The parents' reunification services were terminated and the matter was continued for a section 366.26 hearing to determine the children's permanent placement plans.

## B.    Section 366.26 Hearing

The section 366.26 hearing was held on May 29, 2013. By that time, the children had been living with their grandparents for 16 months. Father was still incarcerated in state prison. Mother had been offered over 12 months of reunification services but she had neither participated in any services nor made any progress in changing the circumstances that led to the children's removal from her care. Mother had visits with the children on five occasions in 2011 and on two occasions in 2012. On April 3, 2013, mother called and requested a visit with the children, which occurred in May shortly before the section 366.26 hearing.

In the agency's assessment report, dated April 3, 2013, and prepared for the originally scheduled hearing date of May 7, 2013, the agency social worker recommended termination of parental rights and that the children should be placed for adoption. In support of the recommendation, the agency social worker described both

---

[3]    We recite only those facts as are necessary to give context to the issues raised on this appeal.

children's physical health, development, education, and mental and emotional status. As to the children's positions on their placement and adoption, the agency social worker reported that both children were " 'sad' " that they no longer saw their mother, and each child had indicated that if they could not live with their mother they wanted to live with their grandparents or a paternal aunt, and they agreed with a plan of adoption. The older child stated she understood that adoption meant she would remain with the grandparents until she was at least eighteen years old. The younger child was not able to articulate what adoption meant, but the agency social worker explained it to her. The agency social worker also provided an assessment of the grandparents as prospective adoptive parents. The children's grandparents, who had known the children since the children's births, were motivated by love and affection to adopt the children and wanted to provide the children with a stable home to keep the family together. The grandparents were willing and able to adopt the children, were aware they would have full financial and legal responsibility for the children when the adoption was finalized, and had a completed and approved home study. The agency recommended that any continued visitation with the birth family should occur at the discretion of the prospective adoptive parents.

The juvenile court admitted into evidence the agency's assessment report and heard testimony from mother and the agency social worker who had been assigned to the case in February 2013 and prepared the section 366.26 assessment report. Mother conceded she had not regularly visited with the children. At the last visit on May 23, 2013, the children said they wanted to come home with mother. There was no discussion as to where the children would live if they could not live with mother.

The agency social worker testified she first met the children in February 2013. By that time "things were already moving forward with adoption." Adoption had been discussed with the children and they were agreeable to it so the social worker chose not to talk to the older child about other options at that time. The older child said she would like to live with her mother but if she could not do so she wanted to be adopted by her grandparents. The child understood that if she were adopted she would not live with her mother and she was going to stay with her paternal grandparents. The agency social

3

worker did not specifically tell the older child that she could object to adoption; rather, the child was asked how she felt about adoption and if she agreed to it and she said she did. The older child also said she wanted to be able to visit and have contact with her mother. The child had earlier expressed concern that she would not be able to see her mother as much as she wanted to do so. However, the child understood that if she were adopted then her grandparents would get to decide when and how much contact she would have with her mother. In explaining the situation to the older child, the agency social worker did not explain that if the child was adopted that her mother would no longer be her mother. The agency social worker also testified that a notice concerning that day's hearing had been sent to the grandparents' home. The social worker was not sure if the older child was specifically told that there was a hearing that day or that she had a right to be present.

The agency social worker testified that she also spoke to the younger child about adoption. The child understood that if she could not live with her mother she was going to be raised by her paternal grandparents and remain in their home. The child was not specifically asked if she want to have visits with her mother, but the social worker understood the child wanted to have some contact with her mother. The younger child had not expressed any concerns that if she were adopted she would not be able to see her mother as much as she wanted to do so.

The agency social worker also testified regarding the information given to the grandparents regarding guardianship and adoption. (§ 366.21, subd. (i)(2)(B).[4]) On November 7, 2012, the grandparents met with the relative assessment staff who provided them with a comparison sheet for guardianship and adoption as well as a pamphlet on permanency. Additionally, the grandparents were aware of the different options of permanency based on a May 15, 2012, letter, in which father discussed his desire for his

---

[4] Section 366.21, subd. (i)(2)(B), requires that "a relative caregiver shall be given information regarding the permanency options of guardianship and adoption, including the long-term benefits and consequences of each option prior to establishing legal guardianship or pursuing adoption."

4

parents "to take guardianship of the children so that they could hand him the children upon his release." The agency's earlier status reports indicated the grandparents were and continued to be open to whatever permanent plan was deemed to be most appropriate for the children. By the time the grandparents met with the current agency social worker they had already made a decision to adopt the children so the worker explained that procedure to them.

At the conclusion of the hearing, mother's counsel objected to termination of mother's parental rights on several grounds: (1) the children had spent a significant time with mother before their removal from her care; (2) there was no indication the older child was told about the section 366.26 hearing or that she had the right to be present and heard on the matter; and (3) there was no indication the agency social worker had explored with the older child the concept of a legal guardianship as opposed to an adoption. In the absence of information regarding the older child's wishes, mother asked that the court not terminate her parental rights. As to the younger child, counsel argued that a similar situation applied and "it sounds again like an exception would apply and that the Court would not necessarily have to terminate parental rights in order to find a permanent plan for these children." Counsel also argued it was not entirely clear that the paternal grandparents knew that they did not have to adopt the children but could opt for guardianship and still provide the permanency that the agency sought for the children.[5]

The children's counsel argued the court should terminate parental rights and declare adoption to be each child's permanent plan. Counsel advised the court of the children's well-being and wishes. (§ 317, subd. (e)(2)[6].) Specifically, counsel stated that

---

[5] Father expressly waived his appearance at the section 366.26 hearing, but his counsel objected to termination of his parental rights and asked the court to find legal guardianship was the appropriate placement plan for each child on the grounds urged by mother's counsel.

[6] Section 317, subdivision (e), provides, in pertinent part: "(2) If the child is four years of age or older, counsel shall interview the child to determine the child's wishes and assess the child's well-being, and shall advise the court of the child's wishes. Counsel shall not advocate for the return of the child if, to the best of his or her knowledge, return of the child conflicts with the protection and safety of the child."

while the children had been living with mother, the older child had been a parent to the younger child, the older child had to bear a great deal of responsibility, and the children were left home alone quite a bit.  The older child now had the ability to be a child and she was sad that she did not see her mother.  Counsel further reported that the children, and particularly the older child, wanted to be adopted, to stop talking about the adoption, and just wanted the adoption to happen.  Based on "the telephone conversations that [counsel had] had with the children and with the caregiver," counsel believed the grandparents' desire was to do the best for the children regardless of whether that meant guardianship or adoption.  "And certainly for these children they do know their mother but they do understand that she's not been in their life for a year.  And they understand that. [¶] Their life now is different.  They're happy with their life and they wish to proceed, I think, if they can't be with their mom.  Certainly that is something that they've wanted and they have wanted it for a long time, but at this point in time they don't even talk about their mom.  You can ask them a question directly about their mother and they don't respond.  It is hurtful for these children that their mother has turned [her] back on them.  [But,] [t]hey do have the ability to recover from this and have a very full life.  In the grandparent[s]' care the children are less rebellious.  They're more relaxed.  There's not the disruptive behavior that's been noted in other court reports."  Counsel also noted the grandmother "would continue to allow mother to have contact with the children . . . she's very open to doing that.  There's not a problem with that in any way, so long as mother behaves appropriately and doesn't show up pounding on the gate and things of that nature."  Counsel concluded by asserting that the children deserved to have the permanence of an adoptive home and that whatever relationship they had with their parents did not outweigh adoption by their grandparents.

The children's counsel also advised the court regarding the older child's absence from the court proceedings.  (§§ 336.26, subd. (h)(2), 349 [7].)  Since the child became 10

---

[7]     Section 366.26, subdivision (h)(2) states: "In accordance with Section 349, the child [who is the subject of a juvenile dependency proceeding] shall be present in court if the child or the child's counsel so requests or the court so orders.  If the child is 10 years

6

she had been questioned about her interest in attending the court proceedings. Each time the child was asked about attending, including "today's hearing," the child said she did not want to come to court. Counsel further advised that the child "understands that this case and her paternal grandparents are moving toward adopting her and her sister. She is in agreement with going forward with that plan. She said she doesn't know where she would live if she could not live with her paternal grandparents. She again expressed wanting the adoption [to] happen. She did not want to keep talking about it any more. She just wanted it to occur. She understood being adopted meant that she would be living with her grandparents until she's an adult. [¶] The hearing for today's date is something that this child was advised of and of her right to attend." Counsel did not know "how many different times and separate times . . . [she] need[ed] to continue to ask a child if she wants to come." Counsel did not know if the older child had been given the exact date of the section 366.26 hearing but it was certainly something the child was well aware of and had expressed that she chose not to participate in the proceeding.

The agency's counsel argued that at the section 366.26 hearing the court's rulings were limited to deciding whether there was clear and convincing evidence the children were adoptable and whether there were any statutory exceptions to termination of parental rights. Counsel argued the children were adoptable, their grandparents wanted to adopt them, and there was no basis to conclude the grandparents did not want to adopt the children. If the children were found adoptable, counsel argued the court should terminate parental rights as there was no showing mother had maintained a regular relationship with the children. Counsel further argued the children had no relationship with either

of age or older and is not present at a hearing held pursuant to this section, the court shall determine whether the minor was properly notified of his or her right to attend the hearing and inquire as to the reason why the child is not present." Section 349 provides, in pertinent part, that "[i]f th[e] minor was not properly notified or if he or she wished to be present and was not given an opportunity to be present, the court shall continue the hearing to allow the minor to be present unless the court finds that it is in the best interest of the minor not to continue the hearing. The court shall continue the hearing only for that period of time necessary to provide notice and secure the presence of the child." (*Id.*, subd. (d).)

7

parent that outweighed the benefits of adoption and it would be detrimental to the children not to go forward with the adoption because it would leave them in the same cycle they had been in during the entire dependency – knowing that their mother was not able to parent them but hoping that something might happen and change.

The juvenile court found, by clear and convincing evidence, that it was likely the children would be adopted and that termination of parental rights would not be detrimental to the children. In explaining its ruling, the court stated: "[The older child] just turned 11 . . . [a]nd there's quite frankly no evidence before the Court that [the child] in any way objects to the adoption. [¶] In fact, to the contrary, [children's counsel] has represented her discussions with [the older child] and the social worker testified to her interactions with both children, and although both [children] are understandably sad that they're not reunited with their mother, . . . especially from a child's perspective, they both stated that they wish to be adopted by their grandparents. Although that was the second choice. But they didn't object to the adoption and they understood the permanency of that. [¶] . . . I also find based on the testimony and evidence before the Court that there was discussion with the grandparents about their various options for permanency and it wasn't limited solely to adoption. But they were provided materials that addressed issues of legal guardianship as opposed to adoption. And I find by clear and convincing evidence that these two girls are indeed adoptable. [¶] What is really sad here is that mother stated from the get-go of this case that she was not going to engage in services. And true to her word, she has not engaged in any services whatsoever. In addition, she has in essence abandoned her daughters by failing to visit [in] almost a year and no one has done this to mom except mom. And that's really sad. And I feel really sorry for these two girls to the extent they're able to understand that their mother has made choices here not to engage in reunification services and has chosen not to participate in their lives and even attempt to reunify with her daughters. She's made no attempts whatsoever

8

based on the record that's before this Court." Mother timely appeals the termination orders.[8]

## DISCUSSION

### I. Juvenile Court's Determination and Consideration of Children's Wishes

Mother argues the termination orders should be reversed and the case remanded because the juvenile court was not adequately informed of the children's wishes, as required by section 366.26, subdivision (h)(1).[9] We disagree.

This court has interpreted subdivision (h)(1) of section 366.26 to "require the juvenile court to receive direct evidence of the children's wishes regarding termination and adoption at the permanency planning hearing. This evidence may take the form of direct formal testimony in court; informal direct communication with the court in chambers, on or off the record; reports prepared for the hearing; letters; telephone calls to the court; or electronic recordings. Although a child's presence in court is not required, an out-of-court statement, as in a report or other form, must reflect the fact that the child is aware that the proceeding involves the termination of parental rights." (*In re Diana G.* (1992) 10 Cal.App.4th 1468, 1480 (*Diana G.*).) The record here meets the requirements of *Diana G.*: The children's "opinions and views on their status and the possible outcome of the permanency planning process were reflected" in both the detailed statement of the children's counsel [10] and the agency's section 366.26 assessment report [11] "and sworn

---

[8]   The appeal is opposed only by the agency. The children's counsel has not filed a responsive brief.

[9]   Section 366.26, subdivision (h) states, in pertinent part:  "(1) At all proceedings under this section, the court shall consider the wishes of the child and shall act in the best interests of the child."

[10]   We see no merit to mother's challenge to the juvenile court's consideration of the statements of the children's counsel. Because mother did not object to the juvenile court's consideration of counsel's statements on the grounds she now asserts on appeal, we deem her arguments forfeited. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 [in dependency appeals, "the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue"], superseded by statute on another ground as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962, 964.) In all events, mother has failed to demonstrate prejudicial error. Unlike the situation in *In*

9

testimony of [the agency] social worker[], based on interviews with the children themselves." (*Diana G., supra*, at p. 1481.)

We are not persuaded by mother's arguments that neither the children nor the grandparents could truly express their wishes and preferences without first knowing that guardianship was an available option. The record demonstrates the juvenile court was well aware of the children's ambivalent feelings about their mother and their desires as to their permanent living arrangements. "The purpose of the statutory injunction that the court 'consider the wishes of the child' simply requires the court to consider what the child's preferences are. . . . But . . . we should not carelessly impose upon them decisions which are heavy burdens even for those given the ultimate responsibility to decide. To ask children with whom they prefer to live or to ascertain what they wish through other

_____

*re Zeth S.* (2003) 31 Cal.4th 396 (*Zeth S.*), we are not here concerned with consideration of an unsworn statement by minor's appointed appellate counsel that the child's maternal grandfather may have felt pressured into choosing adoption over legal guardianship. (*Id.* at pp. 407, 413-414, fn. 11.) Instead, at issue here is counsel's compliance with the statutory requirement to advise the juvenile court of the children's wishes. (§ 317, subd. (e)(2).) The juvenile court's consideration of counsel's statements "in this context does not give rise to the vice [the Supreme Court] condemned in *Zeth S*. – an appellate court's use of new evidence outside the record to second-guess the trial court's resolution of issues properly committed to it by the statutory scheme." (*In re Josiah Z.* (2005) 36 Cal.4th 664, 676.) Additionally, mother cites no authority, and we have found none, that a child's counsel must be sworn before advising the court regarding the child's wishes after interviewing the child in compliance with section 317, subdivision (e). (See *Conservatorship of John L.* (2010) 48 Cal.4th 131, 155 [court could accept counsel's unsworn representations that client did not oppose pending probate proceeding].) Further, there is no evidence the children's counsel misrepresented the children's wishes, and nothing precluded mother from asking the court to allow her to either question the children's counsel or present "further rebuttal evidence." Lastly, the statements made by the children's counsel were consistent with the sworn testimony of the agency social worker who also spoke with the children. Consequently, any error was harmless under any standard of review.

11      Sections 366.21, subd. (i)(1)(E), provides, in pertinent part, that the agency is statutorily required to include in its assessment report for a section 366.26 hearing "a statement from the child concerning placement and the adoption or guardianship . . . unless the child's age or physical, emotional, or other condition precludes his or her meaningful response, and, if so, a description of the condition."

evidence is one thing.  To ask those children to choose whether they ever see their natural parent again or to give voice to approving that termination is a significantly different prospect." (*In re Leo M.* (1993) 19 Cal.App.4th 1583, 1592.)  Additionally, the agency here provided the court with a sufficient assessment of the grandparents' position concerning adoption, which is the statutorily preferred placement for dependent children. We therefore reject mother's contention that reversal and remand is required to allow the juvenile court to consider additional evidence concerning the children's "understanding of and wishes regarding guardianship as opposed to adoption" or the grandparents' "understanding of the[ir] legal and financial responsibilities" and "motivation for adoption over guardianship."  (See *In re Kristen B.* (2008) 163 Cal.App.4th 1535, 1541 ["the Legislature has expressly provided that the best interests of the minor, not his or her wishes, determine the outcome of the case"]; *In re Xavier G.* (2007) 157 Cal.App.4th 208, 214 [where caretaker is able and willing to adopt, "caretaker's preference for guardianship over adoption is irrelevant at a section 366.26 hearing, 'where the court's task [is] to select the plan which best serve[s] the child's interests' "].)

We also see no merit to mother's challenge to the sufficiency of the evidence to support the juvenile court's findings that termination of parental rights was in the best interests of the children because of the likelihood of adoption. [12] "The juvenile court may terminate parental rights only if it determines by clear and convincing evidence that it is likely the child will be adopted within a reasonable time.  [Citations.]  In making this determination, the juvenile court must focus on the child, and whether the child's age, physical condition, and emotional state may make it difficult to find an adoptive family." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 400 (*Erik P.*).)  "Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child

---

[12]     While mother forfeited any argument that the agency's section 366.26 assessment report did not comply with the requirements in section 366.21, subdivision (i)(1)(E), her claim that there was insufficient evidence of the children's adoptability to support termination of parental rights is not forfeited by her failure to argue that issue in the juvenile court.  (*In re Brian P.* (2002) 99 Cal.App.4th 616, 623 (*Brian P.*).)

11

are not likely to dissuade individuals from adopting the minor.  In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649-1650.)

Contrary to mother's contentions, we conclude that "the record contains substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that [the children were] likely to be adopted within a reasonable time." (*Erik P., supra,* 104 Cal.App.4th at p. 400.)  Unlike the situation in *Brian P., supra,* 99 Cal.App.4th 616, the juvenile court's finding of adoptability was not based solely on "[a] social worker's opinion, standing alone." (*Id.* at p. 624.)  Rather, the juvenile court had the benefit of both the agency social worker's testimony and the agency's assessment report which "presented the kind of facts needed to support a finding of adoptability." (*Ibid.*; see § 366.21, subd. (i).)  We see no deficiencies in the evidence that are so "sufficiently egregious" as to "impair the basis for the court's decision to terminate parental rights." (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 413.)  We therefore reject mother's contention that reversal and remand is required to allow the juvenile court to consider additional evidence concerning the children's "adoptability" and the "likelihood of adoption following the Father's release from prison."

We conclude our discussion by noting that mother's challenge to the termination orders is based on the "apparent" premise "that the court, the Agency, and counsel for the minors took the approach of plugging this case into an adoption track, and in so doing collectively put on blinders to the consideration of a guardianship.  In the lives of these children a guardianship was not only an equally viable option but the only one in line with the girls' stated desires."  However, mother ignores the fact that the Legislature has decreed that "guardianship is not in the best interests of children who cannot be returned to their parents.  [Instead,] [t]hese children can be afforded the best possible opportunity to get on with the task of growing up by placing them in the most permanent and secure alternative that can be afforded them." (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419; see *In re Celine R.* (2003) 31 Cal.4th 45, 53 [" '[g]uardianship . . . is not

12

irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child' "].)  Because the juvenile court here "made the necessary findings under the statutory scheme to terminate parental rights, it was inherent in the legislative scheme for the court to find it in [the children's] best interests to pursue a permanent plan of adoption.  By the time of the section 366.26 hearing, [the children] had been subject to dependency proceedings for [20] months.  [They were] in a stable, nurturing environment with relative caregivers committed to adopting [them]."  (*In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1336.)  On this record, we see no reason to further delay the children's "chance at stability and permanence in an adoptive home."  (*In re Salvador M.* (2005) 133 Cal.App.4th 1415, 1422.)

## DISPOSITION

The juvenile court orders are affirmed.


_____
Jenkins, J.


We concur:


_____
McGuiness, P. J.


_____
Pollak, J.