Filed 3/4/14

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

**ORIGINAL**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----


| | |
|---|---|
| Conservatorship of the Person of JOHN D. | C067500 |
| JAMES D. LIVINGSTON, as Acting Public Guardian, etc., | (Super. Ct. No. 10LPSQ0003486) |
| Petitioner and Respondent, | |
| v. | |
| JOHN D., | |
| Objector and Appellant. | |


APPEAL from a judgment of the Superior Court of Shasta County, Cara Beatty, Judge. Affirmed in part and reversed in part.

Paul Bernstein, under appointment by the Court of Appeal, for Objector and Appellant.

Rubin E. Cruse, Jr., County Counsel, Adam M. Pressman, Deputy County Counsel, for Petitioner and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I. and II. of the Discussion.

John D. appeals from a judgment appointing a Lanterman-Petris-Short (LPS) Act conservator of his person. He also appeals the imposition of special disabilities in the letters of conservatorship, denying him the privilege of possessing a driver's license, the right to enter into contracts and the right to possess a firearm. He contends there is not substantial evidence supporting the finding that he cannot provide for his basic needs such as food, clothing and shelter, nor is there evidence supporting the imposition of the special disabilities on his right to enter into contracts, drive and possess firearms. John further contends the trial court erred in requiring him to pay jury fees.

In the published portion of this opinion, we conclude that the trial court erred in ordering John to pay jury fees because there is no statutory authority for such fees.

In the unpublished portion of this opinion, we conclude that the finding of grave disability and the imposition of special disabilities is supported by substantial evidence.

We reverse the jury fee order. In all other respects, the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

### Trial Evidence

John has a longstanding history of mental illness. He was conserved for three years in 2005 in Los Angeles County. John was again placed under conservatorship in 2009, this time in Shasta County. In 2009, John had five psychiatric hospitalizations, each the result of John not taking his medication after being discharged.

Dr. John Mahoney, a Shasta County Mental Health clinical psychologist, examined and evaluated John on a number of occasions and diagnosed him with schizophrenia, paranoid subtype. As a result of his mental illness, John experiences disorganized thoughts and behaviors, hallucinations, and delusions, including delusions that he is employed as an agent for various law enforcement agencies. In the course of each hospitalization, while medicated, John would stabilize in the hospital and be

2

released.  Each time, after he was discharged, he stopped taking his medication and within two to three weeks would be suffering from acute psychotic symptoms.

In August 2010, Dr. Mahoney recommended taking John off the conservatorship, because he appeared to be doing very well.  Although he still had delusions, it did not seem to Dr. Mahoney that the delusions would interfere with John's ability to live independently.  Furthermore, John had changed a living plan from an unrealistic plan of going to Mexico to drive a truck to a more realistic plan to remain in town at a local hotel, the Lorenz,[1] and let the STAR team[2] assist him with his needs.

Around August 2010, Manuel Ramirez, a deputy public guardian for Shasta County, began working with John to transition off conservatorship to independent living.  John's conservatorship was going to terminate at the end of October 2010.  John was consistently taking his medication, following facility rules[3] and attending drug and alcohol abuse meetings.  Although he continued to talk about being involved in law enforcement, at the time the delusions appeared harmless as he was otherwise following all the facility rules.  Ramirez testified that in hindsight, the delusions were sufficient to maintain John on the conservatorship.  In October 2010, after John was moved into the Lorenz Hotel, Ramirez began to receive complaints that John was breaking the facility rules.  He was allowing people in his room at 2:00 or 3:00 a.m. and smoking in his room. Ultimately, John went off conservatorship on November 1, 2010.

Willie Smith, operations manager of the Christian Church Homes, which runs the Lorenz Hotel, testified that she had moved John into the Lorenz on October 1, 2010.

---

[1] The Lorenz Hotel is low-income senior housing.

[2] The STAR team is a group of mental health workers from Shasta County Mental Health that assists mentally ill outpatients in maintaining themselves independently in the community.

[3] The record does not reveal where John was living in August 2010.

At the intake interview, John said he was a CIA agent. He would then say he was an undercover drug enforcement agent. As time went on, John became more difficult and less willing to cooperate with the STAR team. On November 24, 2010, Smith ordered John to move out of the Lorenz Hotel because of his violent behavior directed against the security guards. Specifically, the security guards reported that on October 30 or 31, they had to call the police as John was violent, drinking and threatening them and residents.[4] Thereafter, Smith sent John a letter on November 1 notifying John he would be evicted as a result of his behavior and the danger to other tenants and staff. About a week after writing the letter, Smith saw John and reminded him he would have to move. John got very angry, told her to "F [herself] and called [her] a f'ing bitch and inappropriate language." He later raised his cane at her and told her to get out of his face. Shortly after John moved, he returned to the Lorenz Hotel to get his security deposit. When White told him he would receive it in a timely fashion, John threatened her again, this time telling her that he would get the CIA after her and said, "I will get you for this." Smith was afraid John would assault her. She viewed him as the most frightening tenant she had had in 16 years.

In December 2010, John was committed pursuant to Welfare and Institutions Code section 5150.[5] John had been very agitated and irate and had made several threats toward the STAR team personnel and Dr. Mahoney. He threatened to cut off the heads of all of the STAR team members and slit the throat of his primary service coordinator if they did not give him his money. When asked whether he had any food, John said he did not.

---

[4] County counsel offered evidence of the incident involving the security guards, not for the truth of the matter, but to show the reason why Smith evicted John. The trial court allowed admission of this evidence for that limited purpose, and later instructed the jury accordingly.

[5] Undesignated statutory references are to the Welfare and Institutions Code.

When asked where he could obtain food, John would not answer and disengaged the STAR worker.

Dr. Mahoney again diagnosed John with schizophrenia, paranoid subtype. He noted that although John had had auditory hallucinations in the past, at the present time his symptoms had not progressed that far. However, he continued to suffer from delusions. At their worst in 2009, John said he was the Angel Gabriel and he also said he was eight and one-half months pregnant. More recently, he claimed to simultaneously be a DEA agent, an FBI agent, and an undercover police officer. He said he had an unlimited account at the Déjà Vu Restaurant, which he first said had been set up for him by the Redding Police Department and then said the Chinese Secret Service had set up the account.[6]

Dr. Mahoney administered what he called "the medication tray test," in which the patient is presented with four bottles of simulated medications with a set of directions on each bottle and asked to load two days of medication on the tray. John told Dr. Mahoney that he had helped invent the test. He also said he was a psychiatrist who had attended Harvard and Stanford. John performed the test without error. However, on the "complex figure test," which requires the use of a number of cognitive functions and measures the ability to plan and organize, John scored between the 6th and 10th percentile, suggesting that at least 90 percent of the general population would do better. Dr. Mahoney testified that people who tested in that range are normally able to perform the routine activities of daily living without too much trouble. However, when faced with something particularly complex or something they have not encountered before, they need assistance.

---

[6] As we discuss *post*, John's payee, Elodia Stalcup, had set up an account for him at the Déjà Vu Restaurant. Stalcup paid the restaurant $400 a month on behalf of John, which allowed John to obtain meals there.

Dr. Mahoney opined that John does not believe he has a mental disorder. This lack of insight leads John to believe he does not need treatment or medication. However, John requires medication to keep his symptoms controlled. Without the medication, his psychotic symptoms reemerge. His five hospitalizations were a direct result of his failure to take his medications. Dr. Mahoney also noted that John's bank closed his account after he went there and loudly insisted he was an FBI agent. In addition, John's payee sought to discharge him because of his behavior. Thus, Dr. Mahoney concluded John's "delusionally-driven behavior [is] negatively affecting his ability to manage his money and have housing." The delusions have "caused [John] to behave in ways that hinder his ability to manage his money and get housing or maintain housing, maintain appropriate housing."

During Dr. Mahoney's examination, John was largely calm and cooperative, spoke normally and coherently and was linear in his thinking. He was able to concentrate on the questions being asked. He could provide the names of his medications and adequately follow directions on the bottles. He was able to describe how to go to a grocery store, give a reasonable list of foods to purchase, describe his clothing needs and identify places to purchase clothing. However, he had a "completely unrealistic" plan as to housing. John said he would go to Corning to live with his wife, a person the doctor did not believe existed, and take a job as an undercover officer for SINTF and the DEA.

John entered the representative payee program around November 2, 2010. Elodia Stalcup, of Golden Umbrella, a nonprofit organization that helps seniors, is the representative payee for John's Veteran's Adminstration (VA) payments. Golden Umbrella received $14,775 from the VA for John. Because his bank account was set up as a conserved account, John could not withdraw money from the bank himself. For the first two weeks Golden Umbrella acted as the representative payee, Stalcup was paying John's expenses without a budget. Because John constantly called her for more money, she called the VA for a budget. The VA budgeted $316 for John's rent at the Lorenz,

6

$400 for his food and $200 for a personal allowance.  John ran out of money too quickly, so to ensure he had a roof over his head, Stalcup paid his rent directly and set up an account at the Déjà Vu Restaurant to ensure John had food to eat.  John became upset with the amount of money he was receiving and called Stalcup about that multiple times.  On one occasion, John told her "I'm with the FBI and I know that you have $15,000.00 of mine and I need for you to f'ing give it to me."  Stalcup also got phone calls from two branches of the bank where John had his account.  John was going into the banks and demanding more money.  Stalcup received a letter from the bank saying they would no longer serve John.  Thereafter, her executive director told her to disenroll John from the program, but at the time of the trial, Golden Umbrella remained the payee.

John testified.  He acknowledged that he was conserved in 2005 in Los Angeles.  He was again conserved in Shasta County and released.  John believed that conservatorship was unnecessary.  All he needed was money.  He said he was unable to provide food, clothing and shelter for himself because he was not getting his "Vietnam vet" check from the government.  He indicated that as of the day of his testimony, he had at least $15,000 in the bank.

John described an extensive employment history in law enforcement, beginning with the Santa Cruz County Sheriff's Department working in the jail and with a countywide narcotics enforcement team.  He said when he was in Los Angeles, he worked with the LAPD.  He testified that during a "sting" operation involving other agencies, he was injured.  "I got shot in the foot and the leg and an ambulance ran into my leg and broke my leg, and I was in the hospital for three years down there, so the -- so the -- the Department of Justice assigned me to the sheriff's department down there."

John acknowledged that he suffers from delusions, saying his imagination has "victimized [him] several times."  He said that when he is delusional he claims to work in agencies such as the FBI.  He indicated that in December 2010, he had an "episode" at the behavioral center which he blamed on the medication he had been administered.  He

7

sometimes gets delusional when he drinks coffee. He said he suffers from paranoid schizophrenia. He said Dr. Mahoney had diagnosed him as having schizoaffective disorder with bipolar tendencies, but then changed his diagnosis. He admitted telling a security guard at the Lorenz that he was an FBI agent pursuing an investigation in the county mental health system. He denied ever threatening anyone, but said he might have shouted obscenities at others at the hotel when he was in so much pain from previous injuries that he did not want to be bothered. He denied threatening Smith or Stalcup or yelling obscenities at Smith, although he did not recall whether he had sworn at Stalcup.

When asked whether he was working during the period when he was staying at the Lorenz Hotel, John asked the trial court whether he was under oath. After the court said he was, John testified he had worked part time for the Redding Police Department doing reconnaissance, finding "haunts" where people are using drugs and reporting on that. When he found a house, he would "get the people's information, their . . . names, what kind of drugs, where they come from." Although the work was voluntary, he said he held the rank of captain. He was working under the cover of a schizophrenic wino.

John acknowledged that he authored a "DEA field report," which was admitted into evidence, in which he asked for assistance locating money to start buying drugs, including methamphetamine and heroin, as part of his undercover operation. He testified that the $15,000 he had in the bank was "filtered through the Department of Veteran's Administration" as "front money" for his undercover operation. He said that it was Stalcup's job to filter DEA money to him, but that she was "not compliant," and that she had been indicted along with hundreds of others in the county based on his investigation. He also testified he was working undercover as a "crooked agent" who had shot his partner in Los Angeles and who had served time in prison for the shooting. When asked about a notation on his DEA field report which read, "I'm still working my ass off with the mental health system," John testified "I suppose I should blow the cover right now. I'm the head agent involved in investigating the County Mental Health System of Shasta

8

County. I work for the FBI, United States Federal Bureau of Investigation. I'm the head agent. I have agents right in this courtroom with me." He maintained it was part of his cover to be on a conservatorship and convince the mental health system he was a schizophrenic. He claimed to have been investigating mental health systems since 1963, both in and out of the military. When asked how his investigation was going at the time of his report, he replied, "It was going good. They were convinced I was a schizophrenic." He said it was part of his cover to be conserved.

Although he initially acknowledged during examination by county counsel that he suffers from schizophrenia, later in his examination by his attorney, John denied that he was schizophrenic. He said, "I don't have schizophrenia, . . . let's see. I don't know. I may have it. I don't know. I rather doubt it. . . . [I]f I am a schizophrenia [*sic*], I'm not a typical schizophrenic. I'm a very educated, well-read gentlemanly sort of schizophrenic." When his counsel asked whether he agreed there had been times when he was delusional, John said, "it depends on the . . . word delusional. A child is delusional when he or she picks up a teddy bear and imagines that that's his or her baby or a friend. So . . . I can't really say that it's unnatural for me to be delusional, because I've never been clinically delusional."

John does not feel he needs drugs to treat his schizophrenia. He testified the Haldol and Congentin are placebos, "according to [his] last contact with central command and Sacramento FBI." He said there "was a glitch in the system, and [he did not] think [he was] getting placebos now." He believes he gets along fine without his medication.

John denied being drunk while he was at the Lorenz, although the eviction letter indicated he had been arrested for being drunk in public. He testified that after leaving the Lorenz, he moved to the Redding Inn and stayed there until he got into an argument with the STAR team and they "5150'd" him.

A jury found John gravely disabled due to schizophrenia, paranoid subtype. Thereafter, the court took additional evidence on the issues of placement, special disabilities and payment of fees.

## Placement and Imposition of Special Disabilities

As to placement, Dr. Mahoney indicated a locked facility often serves as a transition from the hospital, providing a structured environment with supervised medication. Dr. Mahoney also acknowledged he had previously been too optimistic in expecting John could be released into the community without more structure or assistance. The court ordered that John be placed in a locked facility.

The court received a February 3, 2011 report from Dr. Mahoney, which it considered when imposing special disabilities. In the report, Dr. Mahoney opined that John was capable of making his own decisions regarding routine medical care, but not regarding the treatment of his mental illness. Dr. Mahoney also opined that John could present a danger to the community if he were allowed to possess a firearm or operate a motor vehicle, and the court issued orders prohibiting John from doing so.

## Order to Pay Jury Fees

Over the public defender's statutory, due process and equal protection objections, the court also ordered John to pay $455.56 in jury fees. The court noted John received $972 per month in maintenance, and $1,320 per month in veteran's benefits and social security. He also reported he had approximately $16,000 in the bank. The court agreed with the county's reasoning that as an LPS case this is a civil matter and the Welfare and Institutions Code and Probate Code indicated that the procedures in the Code of Civil Procedure apply; specifically, that the person demanding a jury trial pay for the jury fees.

10

The court indicated that because John had the ability to pay, its ruling was a compromise[7] for not requiring John to pay public defender fees.[8]

## DISCUSSION

### I. Gravely Disabled

John contends there is not substantial evidence to support the jury's finding of grave disability.

In proceedings under the LPS Act, the public guardian must prove beyond a reasonable doubt that the proposed conservatee is presently gravely disabled. (§ 5350; *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 235 (*Roulet*).) As relevant in this case, to establish "grave disability," the evidence must support an objective finding that due to mental disorder, a person "is unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A); *Conservatorship of Carol K.* (2010) 188 Cal.App.4th 123, 134.) "We review the record as a whole in the light most favorable to the trial court judgment to determine whether it discloses substantial evidence. Substantial evidence, which is evidence that is reasonable, credible, and of solid value, also includes circumstantial evidence. [Citation.]" (*Carol K.*, *supra*, at p. 134, citing *Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1577 (*Walker*).)

John does not challenge the sufficiency of the evidence that he has a mental disorder. He challenges only the finding that his mental disorder renders him unable

---

[7] We make no judgment herein as to whether John must reimburse the county for the public defender's costs. (But see *Conservatorship of Rand* (1996) 49 Cal.App.4th 835.)

[8] Later, county counsel made a request for attorney fees for county counsel's time. The trial court ordered John to pay $1,490 for posttrial matters, but denied county counsel's request for fees for the trial. John does not challenge the imposition of attorney fees in his briefing on appeal.

11

to provide for his personal needs for food, clothing and shelter. He argues there is not substantial evidence that he "cannot eat, dress, or take shelter."

John made it clear he does not believe he needs medication or treatment. And the evidence is clear that without medication, John becomes delusional and psychotic. As a result of not taking his medications, John was hospitalized five times in 2009. As a consequence of John's lack of insight into his mental illness and refusal to take his medication, John has exhibited delusional and violent behavior which has led to his eviction from housing, closure of his bank accounts, and denial of services from his payee. As Dr. Mahoney concluded, his "delusionally-driven behavior is negatively affecting his ability to manage his money and have housing." Indeed, during John's testimony, it became clear he believed his conservatorship was really an undercover operation. It was also clear that he had been fixated on obtaining money to purchase drugs as part of his undercover operation, and from this evidence the jury could infer that John's delusions would cause him to squander his funds and not provide for his basic personal needs for food, clothing, or shelter.

John relies on *Conservatorship of Smith* (1986) 187 Cal.App.3d 903, 909 (*Smith*) to support his claim that he is not gravely disabled as a result of his mental illness. *Smith* is distinguishable. In *Smith*, the treating psychiatrist testified that the proposed conservatee was gravely disabled because her mental disorder caused behavior which brought her into conflict with the community. Because of a delusion that she was the only person who could interpret the Bible, she had been causing disturbances at a church. (*Id*. at pp. 907, 910.) However, the psychiatrist also testified that, despite her disorder, she could feed and clothe herself and provide for her own place to live. (*Ibid*.) By definition, this meant Smith was not gravely disabled. (§ 5008, subd. (h)(1)(A).)

Here, unlike in *Smith,* the mental health expert did not testify that John was capable of taking care of his personal needs for food, clothing, or shelter. In marked contrast to the evidence in *Smith*, Dr. Mahoney testified that John's mental disorder

12

rendered him unable to provide himself food, clothing, or shelter. The other evidence the jury heard supported this conclusion. Thus, there is substantial evidence that as a result of his mental disorder John is unable to provide for his basic need for shelter.

## II. Special Disabilities

John next contends there is not sufficient evidence to support the imposition of the special disabilities denying him the rights and privileges to possess or carry firearms, possess a driver's license, and enter into contracts.

Even " '[i]f a person is found gravely disabled and a conservatorship is established, the conservatee does not forfeit legal rights or suffer legal disabilities merely by virtue of the disability. (§ 5005; [] *Walker*[, *supra*,] 206 Cal.App.3d [at p.] 1578.)' " (*Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 165 (*George H.*).) "Every institutionalized person is entitled to individualized treatment under the 'least restrictive' conditions feasible--the institution should minimize interference with a patient's individual autonomy . . . . (. . . §§ 5325.1, subds. (a), (b), (g); 5358, subds. (a), (c).)" (*Foy v. Greenblott* (1983) 141 Cal.App.3d 1, 10; see *id.* at p. 10, fn. 2.) Consistent with this goal, "[t]he court must separately determine the duties and powers of the conservator, the disabilities imposed on the conservatee, and the level of placement appropriate for the conservatee. (§§ 5357, 5358.)" (*Conservatorship of Christopher A.* (2006) 139 Cal.App.4th 604, 612 (*Christopher A.*).) The conservatee retains the rights and privileges covered by the special disabilities unless the court, after making separate findings of incapacity to support the imposition of the special disabilities, imposes those disabilities and confers corresponding authority on the conservator. (*George H.*, *supra*, 169 Cal.App.4th at p. 165; *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1313.) "The party seeking conservatorship has the burden of producing evidence to support the disabilities sought, the placement and the powers of the conservator, and the conservatee may produce evidence in rebuttal." (*Christopher A.*, *supra*, 139 Cal.App.4th at p. 612.) In other words, there must be

13

evidence in the record to support each of the special disabilities imposed. (See *George H*., *supra*, 169 Cal.App.4th at pp. 165-166.)

Section 5357 allows a court to impose special disabilities on a conservatee. While the trial court "must separately determine . . . the disabilities imposed on the conservatee" (*Christopher A*., *supra*, 139 Cal.App.4th at p. 612), a specific, on-the-record statement of the reasons for each disability imposed is not required (*George H*., *supra*, 169 Cal.App.4th at p. 165). Instead, we follow the usual rules on appeal and review the record as a whole in the light most favorable to the trial court judgment to determine whether it discloses substantial evidence. (*Walker*, *supra*, 206 Cal.App.3d at p. 1577.) The trial court is entitled to draw inferences relevant to the special disabilities from general testimony presented about the conservatee's condition. If, based on testimony about the conservatee's mental and emotional state, the trial court concludes that it would be appropriate to impose the special disabilities, the decision will not be reversed solely because a testifying expert did not expressly address the disabilities. (See, e.g., *George H*., *supra*, 169 Cal.App.4th at p. 165.) For the reasons set forth below, we find substantial evidence to support the imposition of each disability.

## A. Right to Possess a Firearm

To support a limitation on a conservatee's ability to possess a firearm or deadly weapon, the court must find "that possession of a firearm or any other deadly weapon by the person would present a danger to the safety of the person or to others." (§ 8103, subd. (e)(1).) John argues the court made no such finding. However, by imposing the disability, it is clear the court impliedly so found. When viewed in the light most favorable to the judgment, the implied finding is supported by substantial evidence.

John had delusions he was a law enforcement officer involved in undercover drug operations. He made threats to STAR team personnel, including a threat to slit the throat of his primary service coordinator. He threatened Smith, the operations manager of the Christian Church Homes, with a cane, and she stated he was the most frightening

14

tenant she had had in 16 years. Dr. Mahoney opined that John could be a danger to himself or the community if he were allowed to possess a firearm. This was substantial evidence from which the trial court could conclude John could not safely possess a firearm.

## B. Right to Possess a Driver's License

The overriding concern in the issuance of a driver's licenses is generally whether the person is able to operate a motor vehicle safely. (Veh. Code, §§ 12800, subd. (g), 12805, subd. (d), 12806, subd. (c); *People v. Superior Court* (*Wilson*) (1993) 18 Cal.App.4th 31, 36-37.) Mental disorders may affect a person's "ability to exercise reasonable and ordinary control in operating a motor vehicle" (Veh. Code, § 12800, subd. (g)), and may be the basis for refusing that person a driver's license (Veh. Code, §12806, subd. (c)). John's delusions of being involved in undercover law enforcement work and his violent tendencies could put him and others at risk if he were permitted to operate a vehicle. Dr. Mahoney opined that John could present a danger if allowed to operate a motor vehicle. This was substantial evidence supporting the conclusion John could not operate a motor vehicle safely.

## C. Right to Contract

Under Civil Code section 1556, persons of "unsound mind" are not capable of entering into contracts. There are essentially three classifications of incapacity based on an "unsound mind" -- (1) entirely without understanding (Civ. Code, § 38), (2) unsound but not entirely without understanding, and (3) susceptible to undue influence (Civ. Code, § 39; *Smalley v. Baker* (1968) 262 Cal.App.2d 824, 834-835). Here, the evidence demonstrates John is of unsound mind, although not entirely without understanding. John suffers from various delusions, which have included believing he is the Angel Gabriel, he is pregnant, and more recently, simultaneously working for numerous law enforcement agencies doing undercover work investigating the mental health system and drug operations. His inability to manage his finances

15

appropriately, his belief that the funds in his account were "filtered" to him for the purpose of purchasing drugs as part of his undercover operation, his insistence that he be provided that money, and his lack of understanding that he is precluded from directly withdrawing funds from his bank account are all further evidence that he lacks understanding about his financial situation. This is substantial evidence supporting the denial of his right to contract. (See *George H.*, *supra*, 169 Cal.App.4th at p. 166.)

### III. Jury Fees

John contends that the trial court erred in requiring him to pay jury fees. The county contends, "There is no reason that [John] should burden the taxpayers with jury fees for a trial which he demanded. This is especially the case when, as here, [John] has the funds to pay for the services he has requested." John, according to the county, "should . . . be required to pay the same fees as any civil litigant who requests a jury trial." On this point, we disagree with the county.

The county's argument is based on its reading of Welfare and Institutions Code section 5350, Probate Code section 1827, and Code of Civil Procedure section 631. Citing what the county calls the "pertinent part" of Welfare and Institutions Code section 5350, it notes that section 5350 reads in part, "The procedure for establishing, administering and terminating a conservatorship under this chapter shall be the same as that provided in Division 4 (commencing with Section 1400) of the Probate Code . . . ." Division 4 of the Probate Code is the Guardianship-Conservatorship Law and governs the appointment of conservators of the person for " 'adults who for any reason are incapable of taking care of themselves.' [Citation.]" (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 144 (*John L.*).) Probate Code section 1827 states, "The court shall hear and determine the matter of the establishment of the conservatorship according to the law and procedure relating to the trial of civil actions, including trial by jury if demanded by the proposed conservatee." Code of Civil Procedure former section 631

required that a party demanding a jury trial deposit jury fees in advance of trial and provided that the failure to do so resulted in a waiver trial by jury.[9]

There are exceptions to the general rule in Welfare and Institutions Code section 5350 that the procedures to be used in LPS proceedings shall be the same as for establishing, administering, and terminating probate conservatorships and the concomitant application of the Code of Civil Procedure. The exception in section 5350, subdivision (d) relates specifically to LPS Act jury trials. The pertinent part of section 5350 reads more fully, "The procedure for establishing, administering, and terminating a conservatorship under this chapter shall be the same as that provided in Division 4 (commencing with Section 1400) of the Probate Code, *except as follows*: [¶] . . . [¶] "(d) The person for whom conservatorship is sought shall have the right to demand a court or jury trial on the issue whether he or she is gravely disabled. Demand for court or jury trial shall be made within five days following the hearing on the conservatorship petition. . . . [¶] Court or jury trial shall commence within 10 days of the date of the demand, except that the court shall continue the trial date for a period not to exceed 15 days upon the request of counsel for the proposed conservatee." (Italics added.) In our view, by this exception in the LPS Act, the Legislature has provided a

---

[9] Code of Civil Procedure former section 631, in effect at the time of John's trial, provided in pertinent part: . . . "(b) Each party demanding a jury trial shall deposit advance jury fees with the clerk or judge. The total amount of the advance jury fees may not exceed one hundred fifty dollars ($150) for each party. *The deposit shall be made at least 25 calendar days before the date initially set for trial*, except that in unlawful detainer actions the fees shall be deposited at least five days before the date set for trial. [¶] (c) The parties demanding a jury trial shall deposit with the clerk or judge, at the beginning of the second and each succeeding day's session, a sum equal to that day's fees and mileage of the jury, including the fees and mileage for the trial jury panel if the trial jury has not yet been selected and sworn. . . . [¶] (d) A party waives trial by jury in any of the following ways: [¶] . . . [¶] . . . (5) By failing to deposit with the clerk, or judge, advance jury fees as provided in subdivision (b)." (Stats. 2002, ch. 806, § 15, p. 5146, italics added.)

self-contained procedure for *demanding* a jury trial in LPS conservatorship cases and thus, expressly excluded such cases from the provisions of Code of Civil Procedure section 631. And the express exception in subdivision (d) of section 5350 makes no mention of any provision for the payment of jury fees; nor does it make a proposed conservatee's right to a jury contingent upon the payment or deposit of such fees.

That Code of Civil Procedure former section 631 has no application to the procedure for demanding LPS conservatorship jury trials is evident when one looks at the deadline by which a party was required to post the $150 advance fee.[10] Subdivision (b) of Code of Civil Procedure former section 631 expressly required that the advance fee be deposited "at least 25 calendar days before the date initially set for trial." (See fn. 9, *ante*.) LPS conservatorships follow an entirely different timeline than general civil matters, and the requirement that the LPS jury trial commence within 10 days of the demand for jury trial is inconsistent with the *25-calendar-day deadline* for posting the advance jury fee in Code of Civil Procedure former section 631, subdivision (b). Moreover, unlike unlawful detainer actions, which also have shorter timelines than general civil matters, no exception can be found for LPS conservatorship petitions in Code of Civil procedure former section 631.[11] Had the Legislature intended

---

[10] We note that the provisions of Code of Civil Procedure former section 631 were not followed here. John was not required to deposit jury fees prior to trial or post fees daily.

[11] Amendments to Code of Civil Procedure section 631 have since been made, effective September 2012. That section now reads in pertinent part: "(b) At least one party demanding a jury on each side of a civil case shall pay a nonrefundable fee of one hundred fifty dollars ($150), unless the fee has been paid by another party on the same side of the case. . . . [¶] (c) The fee described in subdivision (b) shall be due on or before the date scheduled for the initial case management conference in the action, except as follows: [¶] (1) In unlawful detainer actions, the fees shall be due at least five days before the date set for trial. [¶] (2) If no case management conference is scheduled in a civil action, or the initial case management conference occurred before June 28, 2012, and the initial complaint was filed on or after July 1, 2011, the fee shall

18

to require prospective LPS conservatees to post jury fees, it would have been a simple matter for the Legislature to include an exception to the general deadline rule consistent with deadlines in LPS matters, but it did not and this omission is telling. We conclude that the Legislature did not intend the Code of Civil Procedure section 631 requirements for posting jury fees to apply to persons who are the subject of an LPS petition for conservatorship.

We find no other statutory basis for requiring an LPS conservatee to pay jury fees before, during or after his or her trial has been completed. As with other distinctions between an LPS conservatorship and a probate conservatorship, we believe there is good reason for this distinction. While LPS conservatorship proceedings may be initiated only

be due no later than 365 calendar days after the filing of the initial complaint. [¶] (3) If the initial case management conference occurred before June 28, 2012, and the initial complaint in the case was filed before July 1, 2011, the fee shall be due at least 25 calendar days before the date initially set for trial. [¶] (4) If the party requesting a jury has not appeared before the initial case management conference, or first appeared more than 365 calendar days after the filing of the initial complaint, the fee shall be due at least 25 calendar days before the date initially set for trial. [¶] (d) If a party failed to timely pay the fee described in subdivision (b) that was due between June 27, 2012, and November 30, 2012, the party will be relieved of a jury waiver on that basis only if the party pays the fee on or before December 31, 2012, or 25 calendar days before the date initially set for trial, whichever is earlier. [¶] (e) The parties demanding a jury trial shall deposit with the clerk or judge, at the beginning of the second and each succeeding day's session, a sum equal to that day's fees and mileage of the jury, including the fees and mileage for the trial jury panel if the trial jury has not yet been selected and sworn. . . . ." (Italics added.)

As is apparent from the changes, the Legislature has now fixed the deadline for posting the advance deposit to the "initial case management conference," with exceptions using the timing of the "initial case management conference" and filing of the "initial complaint" as reference points. There are no mandatory case management conferences in LPS matters. Nor do LPS matters involve the filing of a complaint; rather, LPS conservatorship proceedings are initiated by a petition. (Welf. & Inst. Code, § 5352.) Thus, these recent amendments further show that the Legislature never intended the Code of Civil Procedure section 631 requirements for posting jury fees to apply to persons who are the subject of an LPS petition for conservatorship.

19

by an agency-designated conservatorship investigator (Welf. & Inst. Code, § 5352), *private parties*, such as the proposed conservatee himself or herself, his or her spouse or domestic partner, a relative, friend or other interested person have standing to file a petition for a probate conservatorship (Prob. Code, § 1820, subd. (a); *John L.*, *supra*, 48 Cal.4th at p. 144). Government need not be involved in a probate conservatorship. And "[u]nlike an LPS conservatorship, a probate conservatorship does not depend on a showing of grave disability resulting from a mental disorder, and involuntary commitment is not contemplated." (*John L.*, *supra*, 48 Cal.4th at p. 144.) Indeed, while an LPS conservatorship is civil in nature, the prospect of the loss of liberty and the lasting stigma on the conservatee's reputation requires some of the same "powerful safeguards" that are provided to criminal defendants. (*Conservatorship of Ben. C.* (2007) 40 Cal.4th 529, 541 (*Ben C.*).) A proposed conservatee has a right to a jury trial; the party seeking imposition of an LPS conservatorship must prove the proposed conservatee's grave disability beyond a reasonable doubt; and the jury's verdict must be unanimous. (*Ibid.*; *Roulet*, *supra*, 23 Cal.3d at pp. 229-230.)

Moreover, the LPS Act promotes more than private interests. In addition to guarding the rights of proposed conservatees and those who are involuntarily committed and advancing the goal of providing appropriate treatment to such persons, "substantial" public interests are promoted by the LPS Act, including " ' "ending the inappropriate and indefinite commitment of the mentally ill" ' " and " ' "guaranteeing and protecting public safety." ' " (*John L.*, *supra*, 48 Cal.4th at p. 150; *Ben C.*, *supra*, 40 Cal.4th at p. 540; see also § 5350, subd. (b)(2) [in appointing an LPS conservator, the court must consider protection of public as well as treatment of conservatee].) Thus, contrary to the assertion of the county that there is no reason for taxpayers to pay for jurors in LPS Act conservatorship trials, it is reasonable to require the public to fund such proceedings when public interests are advanced.

20

In summary, because of the loss of liberty, stigmatization and the public interests promoted by the statutory scheme, including public safety, and the fact that the procedure for demanding LPS jury trials is one of the exceptions to the application of the Probate Code and the Code of Civil Procedure, we do not think the Legislature intended the entitlement to a jury trial in LPS matters be conditioned on the payment of jury fees.

Accordingly, the order imposing jury fees is reversed.

## DISPOSITION

The order requiring John to pay jury fees is reversed.  In all other respects, the judgment is affirmed.


          MURRAY     , J.


We concur:


       RAYE       , P. J.


    NICHOLSON   , J.