Filed 1/28/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| Conservatorship of the Person of B.K. | B343506 |
| | (Los Angeles County Super. Ct. No. 19HWMH00185) |
| M. G., <br><br>     Petitioner and Respondent, <br><br>     v. <br><br> B.K., <br><br>     Objector and Appellant. | |

APPEAL from a ruling of the Superior Court of Los Angeles County, Scott R. Herin, Judge. Affirmed.

Christian C. Buckley, under appointment by the Court of Appeal for Appellant.

Sarah M. Javaheri, for Respondent.

## INTRODUCTION

Appellant B.K.[1] is under a conservatorship pursuant to the Lanterman-Petris-Short (LPS) Act (Welf. & Inst. Code, § 5000 et seq.).[2] At a hearing in October 2024 to renew the conservatorship, B.K. requested a jury trial. In January 2025, B.K.'s counsel informed the court that she had consulted with B.K., and B.K. chose to have a court trial instead. B.K. confirmed her choice to the court. The court proceeded with the court trial, found that B.K. remained gravely disabled, and renewed the conservatorship.

On appeal, B.K. contends the trial court did not do enough to advise B.K. of her jury trial rights or ensure that her waiver of those rights was knowing and intelligent. We find no error. B.K. acknowledges she was aware of her jury trial right, and under the circumstances we may infer that B.K.'s waiver of that right though her counsel was knowing and intelligent. We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Background*

The LPS Act allows for the appointment of a conservator for "a person who is gravely disabled." (§ 5350.) A person may be deemed "gravely disabled" if, "as a result of a mental health disorder," the person is "unable to provide for their basic personal needs for food, clothing, shelter, personal safety, or necessary medical care." (§ 5008.) Conservatorship "shall automatically terminate one year after the appointment of the conservator by

---

[1] We refer to the parties by their initials to protect their privacy interests. (Cal. Rules of Court, rule 8.90(b)(2).)

[2] All undesignated section references are to the Welfare and Institutions Code.

2

the superior court." (§ 5361, subd. (a).) "[T]he conservator may petition the superior court for reappointment as conservator for a succeeding one-year period." (§ 5361, subd. (b).) "The person for whom conservatorship is sought shall have the right to demand a court or jury trial on the issue of whether the person is gravely disabled," both at the initial stage and during reappointment proceedings. (§ 5350, subd. (d)(1) & (3).) "Subject to a request for a court hearing or jury trial, the judge may, on his or her own motion, accept or reject the conservator's petition" for reappointment. (§ 5362, subd. (b).)

B.K. has schizophrenia. The Los Angeles County Office of the Public Guardian filed a petition for conservatorship of B.K. in August 2019. B.K. was on a psychiatric hold at the time, and the Public Guardian asserted that B.K. was gravely disabled as a result of a mental disorder. A temporary conservatorship was granted on August 8, 2019. On September 4, 2019, the superior court found that B.K. was gravely disabled, and appointed the Public Guardian as conservator over B.K.'s person and estate.

B.K. has remained living in a treatment facility. The Public Guardian petitioned for re-appointment as her conservator in 2020, 2021, 2022, and 2023. In hearings on each petition, the court found that B.K. remained gravely disabled, and renewed the conservatorship for one year.

At times, B.K. requested a trial. In 2021 B.K. initially requested a court trial, but later withdrew her request. In 2023 B.K. told the court she wanted a jury trial. The court ordered that B.K. be assessed and set a hearing to determine whether B.K. had the capacity to request or waive a jury trial. Based on the expert report, the court found that B.K. lacked the capacity to make a decision about demanding or waiving a jury trial.

3

B.    *Proceedings below*

In December 2023 B.K.'s aunt, M.G., was appointed as B.K.'s conservator.  At a progress report hearing in January 2024, B.K. twice requested a jury trial.  The court told B.K. that "we are not quite at that hearing yet," and suggested she speak with her attorney.

In June 2024, the yearly notice of termination of conservatorship was served on B.K., stating that the conservatorship would terminate on September 4, 2024 unless renewed.  The form notice also stated, "There shall be a Court hearing or a jury trial, whichever is requested, on the issue of whether the Conservatee is still gravely disabled and in need of Conservatorship."  In August 2024, M.G. petitioned for reappointment as conservator.

At the termination hearing on September 4, 2024, after counsel's appearances, the following colloquy occurred:

> "The court: [B.K.], we are here to see whether or not you want to stay on conservatorship for another year and have [M.G.] remain your conservator.  What do you think?
>
> "[B.K.]: No.  I want a jury trial.
>
> "The court: okay.  So that means you want to get off conservatorship, you don't want [M.G.] to remain as your conservator, and we have a trial, right?
>
> "[B.K.]: I want a jury trial.
>
> [¶] . . . [¶]
>
> "The court: Why would you like to have a jury trial instead of a court trial?  It is your choice.  I just want to know the reason.

4

"[B.K.]: I want a jury trial because I want to get off conservatorship.

"The court: Okay.

"[B.K.]: I want a jury trial.

"The court: Okay."[3]

At the next hearing on October 16, 2024, B.K. appeared remotely. She was no longer at Alpine, the facility where she had been living since 2020. M.G.'s attorney told the court that B.K. had "[w]alked out on October 7" and certain facilities would not take her back.[4] The court continued the hearing so a new facility could be found, observing, "it's going to take a little bit of time for her to stabilize."

At the next hearing on January 9, 2025, B.K. was present in court with her attorney, Ms. Altes. The court asked B.K., "You know why we are here . . . today?" B.K. responded, "I want to terminate my conservatorship." The court stated that there would be a trial, then the following colloquy occurred:

"The court: So you have demanded a trial. I have not had a waiver as of yet.

---

[3] According to the minute order from this date, on B.K.'s counsel's motion the court appointed Dr. D'Ingillo to examine B.K. as to her mental status and her "capacity to waive statutory jury trial rights," and prepare a report. On M.G.'s counsel's motion, the court appointed Dr. Arom to examine B.K. as to her mental status, and prepare a report. The court scheduled a trial setting hearing. There is no report in the record from either doctor, and B.K.'s capacity to request or waive a jury trial was not addressed again.

[4] The record is not clear as to whether B.K. walked out of Alpine or a different facility on October 7.

"Ms. Altes: So we had a conversation about court versus jury trial and that we would have the court trial today, and I believe [B.K.] would like to have her trial today which would mean it would be a court trial.

"[B.K.]: Yeah.

"The court: Okay. So that means you are waiving and giving up your right to have a jury trial to have a court trial today with me; is that right?

"[B.K.]: Right.

"The court: Counsel joins?

"Ms. Altes: Yes."

In the trial that followed, Dr. Arom provided the following impressions and opinions based on an interview with B.K. B.K. suffered from schizophrenia. She did not know why she was hospitalized; she thought her aunt had kidnapped her and had her locked up. B.K. did not have insight into her condition. She believed that "everybody has schizophrenia," and felt she had no need for medication. Dr. Arom testified that B.K. was "not able to tell me a viable plan for money or for working or for shelter," because B.K. was "internally focused" on the voices she hears. Dr. Arom opined that B.K. did not have the capacity to make an informed decision regarding medication. Dr. Arom also testified that she had interviewed B.K. the year before, and this year B.K.'s "symptoms are more intense. She was transferred to a higher level of care." B.K. was currently "preoccupied with voices and delusions and can't think clearly or realistically."

B.K. also testified on her own behalf. She stated that her medications had no effect other than causing unpleasant side effects. She also testified, "I like the voices" and "I want to keep

6

the voices." B.K. said that M.G. "kidnapped me at Social Security." B.K. testified about what would happen if the conservatorship ended. She testified in vague terms about getting food, clothing, and shelter on her own, but she did not know how much money she had in the bank or the amount of her income from Social Security. She also testified that there would be no need for her to take medication. She further testified, "I don't believe in psychiatry." B.K. had unrealistic plans about future goals.

The trial court found that B.K. remained gravely disabled, and renewed the conservatorship. B.K. timely appealed.

**DISCUSSION**

B.K. asserts she had a right to a jury trial, and "[t]o waive that right, the court either needed to properly advise [B.K] regarding the nature of that right and obtain a personal waiver or allow counsel to waive jury trial upon a finding of incapacity." B.K. contends the record does not show that her agreement to waive a jury trial was "knowing and voluntary." Respondent M.G. asserts that B.K.'s waiver was valid. We find no error.

We review any statutory claims de novo. (*Conservatorship of C.O.* (2021) 71 Cal.App.5th 894, 904 (*C.O.*).) We review for substantial evidence the trial court's implied finding that B.K.'s waiver of her right to a jury trial was knowing and voluntary. (*Id*. at p. 918.) We consider the totality of the circumstances in determining whether a jury trial waiver was knowing, intelligent, and voluntary. (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 170.)

An LPS Act "conservatee is not a criminal defendant and the proceedings are civil in nature." (*Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 537.) A "jury trial is not the default mechanism for reestablishment of a conservatorship" under the

7

LPS Act.  (*C.O., supra,* 71 Cal.App.5th at p. 912.)  As noted above, a "person for whom conservatorship is sought shall have the right to demand a court or jury trial on the issue of whether the person is gravely disabled," both at the initial stage and during reappointment proceedings.  (§ 5350, subd. (d)(1) & (3).)

"Section 5362, subdivision (b), which addresses petitions to reestablish a conservatorship, requires a 'court hearing or jury trial' to be the subject of a 'request.'  (§ 5362, subd. (b).)  If no request is made for a court hearing or jury trial, the judge 'may, on his or her own motion, accept or reject the conservator's petition.'  (*Ibid.*)"  (*C.O., supra,* 71 Cal.App.5th at p. 912; see also *Conservatorship of Joseph W.* (2011) 199 Cal.App.4th 953, 962; *Conservatorship of Deidre B.* (2010) 180 Cal.App.4th 1306, 1312 ["The conservatorship may be reestablished in summary fashion at an initial court hearing, or, upon request, within five days of the initial hearing, through a full court or jury trial"].)

B.K. does not discuss *C.O., supra,* 71 Cal.App.5th 894, which directly addresses jury trial advisements and waivers under the LPS Act.[5]  In that case, C.O. had been placed under an LPS Act conservatorship with the Public Guardian as conservator; the Public Guardian petitioned for reappointment. C.O.'s attorney informed the court in C.O.'s presence that he had conferred with C.O., and C.O. waived his right to a jury trial; the

---

[5]    B.K.'s appellate briefing cites *C.O.* only in a "but see" parenthetical about harmless error.  We remind B.K.'s counsel, that "[a]ttorneys are officers of the court and have an ethical obligation to advise the court of legal authority that is directly contrary to a claim being pressed."  (*In re Reno* (2012) 55 Cal.4th 428, 510, superseded by statute on other grounds as stated in *In re Friend* (2021) 11 Cal.5th 720, 728.)  We trust that counsel will meet this ethical obligation in all future briefing.

"trial court did not advise C.O. on the record of his right to a jury trial or elicit a personal waiver of that right from him."  (71 Cal.App.5th at p. 902.)  Following a court trial, the court renewed the conservatorship.

On appeal, C.O. argued that the trial court erred by failing to adequately advise him on the record of his jury trial right and by failing to take a personal waiver of those rights.  (*C.O., supra*, 71 Cal.App.5th at p. 902.)  Regarding advisement of jury trial rights, the appellate court observed, "Division 4 of the Probate Code—incorporated by reference into section 5350—includes Probate Code section 1828.  That statute provides in relevant part 'before the establishment of a conservatorship of the person or estate, or both, the court shall inform the proposed conservatee of . . . [¶] . . . [¶] . . . the right . . . to have the matter of the establishment of the conservatorship tried by jury.'"  (*C.O., supra*, 71 Cal.App.5th at pp. 904-905, quoting Prob. Code, § 1828, subd. (a)(6).)  Based on this language, the court held that under the LPS Act, "the trial court must directly advise a proposed conservatee of his or her right to a jury trial over the matter of the establishment or reestablishment of the conservatorship."  (*C.O., supra*, 71 Cal.App.5th at p. 909.)  The court held that the trial court's failure to directly advise C.O. of his jury trial right was statutory error, but the error was harmless.  (*Id*. at pp. 909, 919.)

The *C.O.* court also considered whether the trial court's acceptance of a waiver from counsel was error, and held that it was not. *C.O.* held that "absent circumstances suggesting the proposed conservatee's counsel lacked actual authority, counsel disregarded [the] client's wishes, or that the proposed conservatee was actually unaware of [the] right to a trial by

9

jury[,] counsel may waive on behalf of the proposed conservatee his or her right to have the matter of establishment or reestablishment of the conservatorship decided by jury trial." (*Id.* at p. 911.) *C.O.* noted that it is well established "that in LPS proceedings a conservatee's counsel may waive the conservatee's right to jury trial." (*C.O., supra*, 71 Cal.App.5th at p. 905, citing *Conservatorship of Maldonado* (1985) 173 Cal.App.3d 144, *Conservatorship of Mary K.* (1991) 234 Cal.App.3d 265, and *Conservatorship of John L.* (2010) 48 Cal.4th 131 (*John L.*).)

The *C.O.* court observed, "It is undisputed that C.O.'s attorney had consulted with him about his trial rights, and C.O. had elected a court trial. It is also undisputed that C.O. was present in court when his attorney informed the court that C.O. wished to proceed by court trial, and C.O. participated fully in the trial without objection, including as a witness." (*C.O., supra*, 71 Cal.App.5th at p. 908.) The court concluded that "the trial court did not violate C.O.'s statutory rights when it accepted counsel's waiver of C.O.'s right to jury trial before conducting a court trial on the matter of the reestablishment of his LPS conservatorship." (*Id.* at p. 913.)

This case is similar to *C.O.*, except that B.K. acknowledges she was aware she was entitled to a jury trial. She requested a jury trial repeatedly at the September 4 hearing, and the court set a trial date in response. On January 9, B.K.'s counsel told the court in B.K.'s presence that she had conferred with her client and B.K. waived her right to a jury trial; B.K. confirmed this was her choice. B.K. then participated in the court trial without objection, including testifying on her own behalf. There is no suggestion that B.K.'s counsel lacked authority or disregarded B.K.'s wishes. B.K. argues that the court failed to "inquire

10

further regarding [B.K.'s] understanding and decision" with respect to her waiver, but she cites no authority suggesting that the court was required to do so in this context.  As the Supreme Court stated in *John L., supra*, 48 Cal.4th at p. 153, "'"When counsel is present, a voluntary and intelligent waiver of known rights may properly be inferred from the record, without a specific on-the-record showing as to each right."'"

This case is not similar to *Conservatorship of Heather W.* (2016) 245 Cal.App.4th 378 (*Heather W.*), upon which B.K. relies. In that case, the trial court "advised Heather W. of her right to testify, but did not advise her that she had a right to a jury trial." (245 Cal.App.4th at p. 381.)  The Court of Appeal held that the lack of an advisement or waiver was error and reversed. Nor is this case like *Conservatorship of Kevin A.* (2015) 240 Cal.App.4th 1241, in which "the trial court accepted the waiver proffered by Kevin A.'s attorney over Kevin A.'s express wishes," and the appellate court found that automatic reversal was required.  (240 Cal.App.4th at pp. 1251, 1253.)

B.K. also relies on comparisons to jury trial waivers in cases involving mentally disordered offender (MDO) commitments (*People v. Blackburn* (2015) 61 Cal.4th 1113 (*Blackburn*) and *People v. Blancett* (2017) 15 Cal.App.5th 1200), a case involving a not guilty by reason of insanity (NGI) commitment (*People v. Tran* (2015) 61 Cal.4th 1160 (*Tran*)), and a criminal case (*People v. Daniels* (2017) 3 Cal.5th 961).  The comparisons are not apt.

The Supreme Court in *Blackburn* observed that the MDO statutory scheme required the trial court to "'advise'" an MDO defendant of "'the right to a jury trial'" and hold a jury trial "'unless waived by both the person and the district attorney.'"

(*Blackburn, supra*, 61 Cal.4th at p. 1116 citing Pen. Code § 2972, subd. (a).)  As a result, the court held that "the trial court must advise the MDO defendant personally of his or her right to a jury trial and, before holding a bench trial, must obtain a personal waiver of that right from the defendant unless the court finds substantial evidence . . . that the defendant lacks the capacity to make a knowing and voluntary waiver."  (61 Cal.4th at p. 1116.)  In *Tran*, a companion case filed the same day as *Blackburn*, the Supreme Court reached the same conclusion for NGI commitments based on "nearly identical language in the statutory scheme."  (*Tran, supra*, 61 Cal.4th at p. 1163, citing (Pen. Code § 1026.5, subd. (b)(3) & (4).)  The reasoning of these cases is echoed in B.K.'s argument that the trial court "either needed to properly advise [B.K] regarding the nature of [the jury trial] right and obtain a personal waiver or allow counsel to waive jury trial upon a finding of incapacity."

C.O. concluded that due to significant differences in the statutory schemes, the reasoning of MDO and NGI cases is of limited assistance in an LPS case.  Unlike the MDO and NGI schemes, "the LPS statutory scheme does not reference jury trial waiver at all" and "the language of the LPS Act does not reflect a preference for jury trials over court trials."  (*C.O., supra*, 71 Cal.App.5th at p. 912.)  *C.O.* also did not follow the reasoning of *Heather W., supra*, 245 Cal.App.4th 378, which compared MDO and NGI determinations to LPS Act commitments. *C.O.* noted, "*Heather W.* did not specifically examine the applicable jury or court trial demand language of the LPS Act or compare it to the statutory language at issue in *Tran* and *Blackburn*."  (*C.O., supra*, 71 Cal.App.5th at p. 907.)  We decline to follow the reasoning of *Heather W.* for the same reason.

12

B.K.'s reliance on criminal case *People v. Daniels*, *supra*, 3 Cal.5th 961 is similarly misplaced. First, LPS Act proceedings are civil, not criminal. (*Conservatorship of Ben C., supra*, 40 Cal.4th at p. 537.) "Because of their differing objectives, 'the analogy between criminal proceedings and proceedings under the LPS Act is imperfect at best and . . . not all of the safeguards required in the former are appropriate to the latter.'" (*John L.*, *supra*, 48 Cal.4th at p. 151.) Second, a central issue in *People v. Daniels* was the defendant's lack of counsel. A divided Supreme Court found that the trial court failed to obtain a knowing and intelligent jury trial waiver from the defendant, who was representing himself, because the court did not verify that the defendant understood what a jury trial entailed at the various stages of the proceedings. (*Daniels, supra*, 3 Cal.5th at pp. 996, 1007, 1030-1031.) In the lead opinion, Justice Cuéllar emphasized that representation by counsel is an important factor in determining whether a criminal defendant's jury trial waiver was knowing and intelligent: "Counsel plays a crucial part in transmitting information to the client. Time and time again, our precedent has recognized as much . . . ." (*Id*. at p. 996; see also pp. 1009-1010 (conc. & dis. opn. of J. Liu) [acknowledging that "the absence of counsel is a significant factor in assessing whether a jury trial waiver is knowing and intelligent"].)

Here, B.K. was neither a criminal defendant, nor was she representing herself. Her counsel stated that she had conferred with B.K. about her rights, and B.K. acknowledges that "[t]here is no dispute that [B.K.] knew she had a right to a jury trial." B.K. confirmed to the court that she chose a court trial, and she participated in the trial without objection. Thus, substantial evidence supports the trial court's implicit conclusion that B.K.

knowingly and intelligently waived her right to a jury trial. Based on the totality of the circumstances, the trial court did not violate B.K.'s statutory rights when it accepted the waiver of her right to jury trial.

Even if we were to assume for the sake of argument that an additional advisement was required before the court accepted B.K.'s waiver, any error was harmless. (*C.O., supra*, 71 Cal.App.5th at p. 919 [applying a harmless error analysis]; *People v. Sivongxxay, supra*, 3 Cal.5th at p. 187 [same].) Under the harmless error standard, B.K. must show that it is reasonably probable that a result more favorable to her would have been reached in the absence of the error. (*C.O., supra*, 71 Cal.App.5th at p. 917.) B.K. has not made such a showing. B.K. does not challenge the court's finding that she was gravely disabled, which was supported by the testimony of Dr. Arom and B.K. herself. There is no suggestion that a jury trial, had B.K. chosen one, would have resulted in a different outcome. B.K. therefore has failed to demonstrate reversible error.

## DISPOSITION

The ruling is affirmed.

**CERTIFIED FOR PUBLICATION**


COLLINS, J.


We concur:


ZUKIN, P. J.


TAMZARIAN, J.


14